## EX PARTE KUMEZO KAWATO.

No. 10, Original. Argued October 12, 1942.—Decided November 9, 1942.

*Kumezo Kawato* submitted *pro se.*

*Mr. Lasher B. Gallagher* argued the cause for Leon R. Yankwich, Judge.

*Solicitor General Fahy* and *Mr. Robert L. Stern* filed a brief on behalf of the United States, as *amicus curiae,* in support of petitioner.

MR. JUSTICE BLACK delivered the opinion of the Court.

The petitioner, born in Japan, became a resident of the United States in 1905. April 15, 1941, he filed a libel in admiralty against the vessel Rally in the District Court for the Southern District of California. He claimed wages were due him for services as a seaman and fisherman on the Rally, and sought an allowance for maintenance and cure on allegations that he had sustained severe injuries while engaged in the performance of his duties. Claimants of the vessel appeared and filed an answer on grounds not here material, but later, on January 20, 1942, moved to abate the action on the ground that petitioner, by reason of the state of war then existing between Japan and the United States, had become an enemy alien and therefore had no "right to prosecute any action in any

court of the United States during the pendency of said war." The District Judge granted the motion. Petitioner sought mandamus in the Circuit Court of Appeals for the Ninth Circuit to compel the District Court to vacate its judgment and proceed to trial of his action, but his motion for leave to file was denied without opinion. We granted leave to file in this Court, 316 U. S. 650, and the cause was submitted on answer, briefs and oral argument:

Although the court's order of abatement for the duration of the war rested solely on the ground of petitioner's status as an alien enemy, it has been argued here that the writ should be denied because the court could have dismissed the bill on other grounds, particularly claimed defects in the allegations of the libel. These contentions are irrelevant here. Unless the action was properly abated for the reasons set out in the motion and the court's order, the petitioner is entitled to have the District Court proceed with his action and pass upon the sufficiency of his allegations. This is an essential step in an orderly trial leading to a final judgment from which an appeal will lie to correct errors. If the court's order of abatement was erroneous, mandamus is the appropriate remedy. 28 U. S. C. 377; *McClellan* v. *Carland,* 217 U. S. 268, 279–282; *Ex parte Metropolitan Water Co.,* 220 U. S. 539, 546.

"Alien enemy" as applied to petitioner is at present but the legal definition of his status because he was born in Japan, with which we are at war. Nothing in this record indicates, and we cannot assume, that he came to America for any purpose different from that which prompted millions of others to seek our shores—a chance to make his home and work in a free country, governed by just laws, which promise equal protection to all who abide by them. His suit invokes the protection of those laws through our courts both to obtain payment of wages alleged to have been promised him by American citizens for lawful work

and reimbursement on account of damages suffered while working for those citizens.

Petitioner contends that he has the right under the common law and treaties to proceed with his action, and that this right is not limited by the statutes. In our view the possibility of treaty rights, which has not been argued extensively, need not be considered. Applicable treaties are ambiguous and should not be interpreted without more care than is necessary in this case.[1]

There doubtless was a time when the common law of England would have supported dismissal of petitioner's action, but that time has long since passed. A number of early English decisions, based on a group concept which made little difference between friends and enemies barred all aliens from the courts. This rule was gradually relaxed as to friendly aliens[2] until finally, in *Wells* v. *Williams*, 1 Ld. Raym. 282 (1698), the court put the necessities of trade ahead of whatever advantages had been

---

[1] Petitioner argues that his case is covered by article 23 h of the Annex to the IVth Hague Convention of 1907: "It is especially prohibited . . . to declare abolished, suspended, or inadmissible in a Court of law the rights and action of the nationals of the hostile party." This clause, which was added to the convention of 1899 without substantial discussion either by the Delegates in General Assembly or by the committee and sub-committee which dealt with it, III Proceedings of the Hague Convention of 1907, 12, 107, 136, 240; and I *ibid.* 83, was construed by an English Court to apply solely in enemy areas occupied by a belligerent. *Porter* v. *Freudenberg*, [1915] 1 K. B. 857. The question has not been raised in the courts in this country, but the English interpretation was repeated with approval by Representative Montague of the Interstate Commerce Committee in his address to the House when he presented to it the Trading with the Enemy Act. 55 Cong. Rec. 4842 (1917).

[2] According to Littleton, an alien might not sue in either a real or personal action; but this rule was modified by Coke to bar such actions only by alien enemies and to permit personal actions by alien friends. See Coke on Littleton 129 b. Pollock and Maitland suggest that this modification by Coke was "a bold treatment of a carefully worded

imagined to exist in the old rule, and held that enemy aliens in England under license from the Crown might proceed in the courts. As applied ever since, alien enemies residing in England have been permitted to maintain actions, while those in the land of the enemy were not; and this modern, humane principle has been applied even when the alien was interned, as is petitioner here.[3] *Schaffenius* v. *Goldberg*, [1916] 1 K. B. 284.

The original English common law rule, long ago abandoned there, was, from the beginning, objectionable here. The policy of severity toward alien enemies was clearly impossible for a country whose lifeblood came from an immigrant stream. In the war of 1812, for example, many persons born in England fought on the American side.[4] Harshness toward immigrants was inconsistent with that national knowledge, present then as now, of the contributions made in peace and war by the millions of immigrants who have learned to love the country of their adoption more than the country of their birth. Hence in 1813

---

text." 1 History of English Law, 2d ed., 459. The early law treated all aliens as a group. See the sub-titles of Pollock and Maitland's chapter, "The Sorts and Conditions of Men," some of which are: The Knights, The Unfree, The Clergy, Aliens, The Jews, Women, etc. *Ibid.*, Chap. II. For a summary of English views now largely obsolete on alien standing in court, see Hansard, Law Relating to Aliens, chap. 7 (1844). For a survey of the common law on inheritance of land by aliens, see *Techt* v. *Hughes*, 229 N. Y. 222, 128 N. E. 185 (Cardozo, J.).

[3] Petitioner was interned some months after the court had abated his action. The Government has filed a supplemental brief stating that it does not consider that this circumstance alters the position of petitioner in respect to his privilege of access to the courts.

[4] One writer estimates that half of the 400 men on board the Constitution when it captured the Guerriere were seamen who had deserted the British, and the ship United States was reported by its captain to have no men on board who had not served with British warships. Bradley, The United Empire Loyalists, 192; and see 3 McMaster, History of the United States, 242.

Chief Justice Kent, in *Clarke* v. *Morey,* 10 Johns. 69, 72, set the legal pattern which, with sporadic exceptions, has since been followed.[5]  The core of that decision he put in these words: "A lawful residence implies protection, and a capacity to sue and be sued.  A contrary doctrine would be repugnant to sound policy, no less than to justice and humanity." [6]  Thus the courts aligned their policy with that enjoined upon the President by Congress in 1812, when it directed him to administer the laws controlling aliens in a manner that would be "consistent with the public safety, and according to the dictates of humanity and national hospitality."  50 U. S. C. § 22.

In asking that the rights of resident aliens be abrogated in their behalf, private litigants in effect seek to stand in the position of government.  But only the Government, and not the private individual, is vested with the power to protect all the people, including loyal aliens, from possible injury by disloyal aliens.  If the public welfare demands that this alien shall not receive compensation for his work or payment for his injuries received in the course of his employment, the Government can make the decision without allowing a windfall to these claimants.  Even if petitioner were a non-resident enemy alien, it might be more appropriate to release the amount of his claim to the

[5] For collection of cases, see 30 Georgetown L. J. 421; 28 Virginia L. R. 429; 27 Yale L. J. 105; Huberich, Trading With The Enemy, 188 *et seq.; Daimler Co.* v. *Continental Tyre Co.,* Anno. Cas. 1917 C, 170, 204; *Petition of Bernheimer,* 130 F. 2d 396; and for English cases, McNair, Legal Effects of War.

[6] Story was one of the few commentators to approve any part of the early common law rule.  He accepted so much of that doctrine as required enemy aliens entitled to relief in the courts to have entered the country under safe conduct or license.  Story on Civil Pleadings, p. 10; Story's Equity Pleadings, § 51–54, and particularly § 724.  This requirement was reduced to legal fiction in *Clarke* v. *Morey, supra,* at 72, when Chief Justice Kent held that "The license is implied by law and the usage of nations."

Alien Property Custodian rather than to the claimants; and this is precisely what was done in *Birge-Forbes Co.* v. *Heye,* 251 U. S. 317, 323, in which this Court said that the sole objection to giving judgment for an alien enemy "goes only so far as it would give aid and comfort to the other side." The ancient rule against suits by resident alien enemies has survived only so far as necessary to prevent use of the courts to accomplish a purpose which might hamper our own war efforts or give aid to the enemy. This may be taken as the sound principle of the common law today.

It is argued that the petitioner is barred from the courts by the Trading with the Enemy Act, 50 U. S. C. Appendix. The particular clause relied on is § 7: "Nothing in this Act shall be deemed to authorize the prosecution of any suit or action at law or in equity in any court within the United States by an enemy or ally of enemy prior to the end of the war, except as provided in Section 10 hereof [which relates to patents]; . . ." Analysis of its terms makes clear that this section was not meant to apply to petitioner, and an examination of its legislative history makes this doubly certain. Section 7 bars from the courts only an "enemy or ally of enemy." Section 2 of the Act defines the "alien enemy" to which the Act applies as those residing within the territory owned or occupied by the enemy; the enemy government or its officers; [7] or citizens

---

[7] Some possible confusion on the part of the court below and of other courts may have developed from our per curiam opinion in *Ex parte Colonna,* 314 U. S. 510, in which leave to file a petition for writs of prohibition and mandamus in connection with a proceeding brought in behalf of the Italian government was denied on the basis of the Trading with the Enemy Act. That opinion emphasized that an enemy government was included within the definition of the classification "enemy" as used in that act, and that such enemy plaintiffs had no right to prosecute actions in our courts. The decision has no bearing on the rights of resident enemy aliens. The Colonna decision was momen-

of an enemy nation, wherever residing, as the President by proclamation may include within the definition. Since the President has not under this Act [8] made any declaration as to enemy aliens, the Act does not bar petitioner from maintaining his suit.

This interpretation, compelled by the words of the Act, is wholly in accord with its general scope, for the Trading with the Enemy Act was never intended, without Presidential proclamation, to affect resident aliens at all. Prior to the passage of the Act, the courts had consistently held that, during a state of war, commercial intercourse between our nationals and non-resident alien enemies, unless specifically authorized by Congress and the Executive, was absolutely prohibited, and that contracts made in such intercourse were void and unenforceable.[9] This strict barrier could be relaxed only by Congressional direction, and therefore the Act was passed with its declared purpose "to mitigate the rules of law which prohibit all intercourse between the citizens of warring nations, and to permit, under careful safeguards and restrictions, certain kinds of business to be carried on." [10] Thus Congress expressly recognized by the passage of the Act that "the more enlightened views of the present day as to treat-

tarily misapplied in *Kaufman* v. *Eisenberg,* 177 N. Y. Misc. 939, 32 N. Y. S. 2d 450, but the trial judge corrected a stay in proceedings he had previously allowed, upon his further consideration of the fact that the plaintiff was a resident alien.

[8] The President has issued a Proclamation taking certain steps with reference to alien enemies under the Alien Enemy Act of 1798 as amended, 50 U. S. C. § 21, but this Proclamation has no bearing on the power of the President under the Trading with the Enemy Act.

[9] Report of the Senate Committee on Commerce, Report No. 111, 65th Cong., 1st Sess., pages 15–22. *Coppell* v. *Hall,* 7 Wall. 542, 554, 557, 558.

[10] Report of the Senate Committee on Commerce, Report No. 111, 65th Cong., 1st Sess., 1.

ment of enemies makes possible certain relaxations in the old law." [11]

Since the purpose of the bill was to permit certain relations with non-resident alien enemies, there is no frustration of its purpose in permitting resident aliens to sue in our courts. Statements made on the floor of the House of Representatives by the sponsor of the bill make this interpretation conclusive. [12]

Not only has the President not seen fit to use the authority possessed by him under the Trading with the Enemy Act to exclude resident aliens from the courts, but his administration has adopted precisely the opposite program. The Attorney General is primarily responsible for the administration of alien affairs. He has construed the existing statutes and proclamations as not barring this petitioner from our courts, [13] and this stand is em-

---

[11] Report of the Senate Committee on Commerce, Report No. 111, 65th Cong., 1st Sess., 2.

[12] "Mr. Montague: A German resident in the United States is not an enemy under the terms of the bill, unless he should be so declared subsequently by the proclamation of the President, in which case he would have no standing in court." . . .

"Mr. Stafford: Do I understand that this bill confers upon the President any authority to grant to an alien subject doing business in this country the right to sue in the courts to enforce his contract?

"Mr. Montague: If he is a resident of this country, he has that right under this bill without the proclamation of the President.

"Mr. Stafford: If so, where is that authority?

"Mr. Montague: In the very terms of the bill defining an enemy, whereby German residents in the United States have all rights in this respect of native-born citizens, unless these rights be recalled by the proclamation of the President for hostile conduct on the part of the Germans resident in the United States." 55 Cong. Rec. 4842, 4843 (1917).

[13] "No native, citizen, or subject of any nation with which the United States is at war and who is resident in the United States is prevented by federal statute or regulation from suing in federal or state courts." Dept. of Justice press release, Jan. 31, 1942.

phasized by the Government's appearance in behalf of petitioner in this case.[14]

The consequence of this legislative and administrative policy is a clear authorization to resident enemy aliens to proceed in all courts until administrative or legislative action is taken to exclude them. Were this not true, contractual promises made to them by individuals, as well as promises held out to them under our laws, would become no more than teasing illusions. The doors of our courts have not been shut to peaceable law-abiding aliens seeking to enforce rights growing out of legal occupations. Let the writ issue.

---

[14] The determination by Congress and the Executive not to interfere with the rights of resident enemy aliens to proceed in the courts marks a choice of remedies rather than a waiver of protection. The Government has an elaborate protective program. Under the Alien Enemy Act, 50 U. S. C. § 21, the President has ordered the internment of aliens, has instituted a system of identification, and has regulated travel. Under the First War Powers Act, 50 U. S. C. Supp. I, 1940 ed. Appendix, § 5 (b), and various executive orders he has controlled the funds of resident enemy aliens. Many other statutes make a composite pattern which Congress has apparently thought adequate for the control of this problem. See, e. g., the controls on alien ownership of land in the territories, 8 U. S. C. Chap. 5.