H. P. Drewry, S.A.R.L., Plaintiff, *v.* Aristoteles S. Onassis, Defendant.[*]

Supreme Court, Special Term, New York County, November 16, 1942.

*Bigham, Englar, Jones & Houston* for defendant, appearing specially.

*Duer, Strong & Whitehead* for plaintiff.

Collins, J.   Defendant moves for judgment dismissing the complaint pursuant to section 2 and section 7, subdivision (b), of the Trading with the Enemy Act (U. S. Code, tit. 50, Appendix, § 2, § 7, subd. [b]), on the ground that the plaintiff is an enemy alien within the terms of the Act, and on the additional ground that the court lacks jurisdiction to entertain the action.

The suit seeks to recover the sum of $362,489.65, with interest, predicated on a judgment of the High Court of Justice of England, King's Bench Division, for an equivalent amount, rendered on February 12, 1942, which confirmed an award of an arbitration in a special case entitled " In the Matter of an Arbitration between H. P. Drewry, S.A.R.L., Claimant, and Aristoteles S. Onassis, Respondent." The dispute which culminated in the arbitration and award in favor of the plaintiff and against the defendant had its origin in a controversy between the plaintiff and the defendant, arising out of the alleged breach of a charter party executed and delivered in Paris on August 10, 1939.

The facts in the arbitration proceedings are of little materiality here inasmuch as there is no dispute concerning the regularity or validity of the judgment. The primary present issue is the status of the plaintiff.

[*] Revd. 266 App. Div. 292.

That plaintiff is a French corporation, with its principal place of business in Paris — Vichy France — is obvious. That such territory was and still is occupied by the military and naval forces of the German Reich is likewise incontrovertible. Since the projection of this motion the German occupation has been extended to the whole of France within continental Europe. Hence, all such territory is " enemy territory " within the meaning of the Trading with the Enemy Act. Our Treasury Department has accordingly enlarged the regulations governing the control of foreign funds and trade to encompass all " that portion of France within continental Europe."

I am unable to perceive how the plaintiff can escape from the provisions of the Trading with the Enemy Act. The arbitrator found it to be " a corporate body incorporated under the laws of France. It was formed in May, 1932, with its registered office in Paris." The findings, furthermore, indicate that at the time of the trial before the arbitrator, plaintiff continued to do business in occupied France, even though the individual who owned most of plaintiff's corporate stock, and who was and is a British subject, had fled to England. Again, the judgment sued on adjudges the plaintiff to be an enemy of Great Britain, both under the English common law and under the English Trading with the Enemy Act.

Our Trading with the Enemy Act defines the term " enemy " as:

" (a) Any individual, partnership or other body of individuals, of any nationality, resident within the territory (including that occupied by the military and naval forces) of any nation with which the United States is at war, or resident outside the United States and doing business within such territory, and of any corporation incorporated within such territory of any nation with which the United States is at war or incorporated within any country other than the United States and doing business within such territory." (U. S. Code, tit. 50, Appendix, § 2.)

In *Porter* v. *Freudenberg* ([1915] 1 K. B. 857), the British Court of Appeals held:

" The main questions to be considered are, first, the capacity of alien enemies to sue in the King's Courts; secondly, their liability to be sued; thirdly, their capacity to appeal to the Appellate Courts, and, generally, their right to appear and be heard in the King's Court. * * *

" In ascertaining the rights of aliens the first point for consideration is whether they are alien friends or alien enemies.

\* \* \* Alien enemies have no civil rights or privileges unless they are here under the protection and by permission of the Crown: Blackstone, 21st ed., vol. 1, c. 10, p. 372.\* \* \* The question is whether a man who resides under the allegiance and protection of an hostile State for all commercial purposes is not to be considered to all civil purposes as much an alien enemy as if he were born there? If we were to hold that he was not, we must contradict all the modern authorities upon this subject. That an Englishman from whom France derives all the benefit which can be derived from a natural-born subject of France should be entitled to more right than a native Frenchman would be a monstrous proposition. While the Englishman resides in a hostile country he is a subject of that country, and it has been held that he is entitled to all the privileges of a neutral country while resident in a neutral country. \* \* \*

" Whenever the capacity of an alien enemy to sue or proceed in our Courts has come up for consideration, the authorities agree that he cannot enforce his civil rights and cannot sue or proceed in the civil Courts of the realm."

Section 3 of our Trading with the Enemy Act provides:

" It shall be unlawful — (a) For any person in the United States, except with the license of the President, granted to such person, or to the enemy, or ally of enemy, as provided in this Act, to trade, or attempt to trade, either directly or indirectly, with, to, or from, or for, or on account of, or on behalf of, or for the benefit of, any other person, with knowledge or reasonable cause to believe that such other person is an enemy or ally of enemy, or is conducting or taking part in such trade, directly or indirectly, for, or on account of, or on behalf of, or for the benefit of, an enemy or ally of enemy."

Section 2 of the Act provides:

" The words ' to trade,' as used herein, shall be deemed to mean —

" (a) Pay, satisfy, compromise, or give security for the payment or satisfaction of any debt or obligation.

" (b) Draw, accept, pay, present for acceptance · or payment, or indorse any negotiable instrument or chose in action.

" (c) Enter into, carry on, complete, or perform any contract, agreement, or obligation.

" (d) Buy or sell, loan or extend credit, trade in, deal with, exchange, transmit, transfer, assign, or otherwise dispose of, or receive any form of property.

" (e) To have any form of business or commercial communication or intercourse with."

The exception noted in section 7 of the Act does not rescue this case because plaintiff is not engaged in business in the United States; it is not qualified to do business here; and it has not been licensed to collect this judgment. Section 7, subdivision (b), provides in part:

" Nothing in this Act shall be deemed to authorize the prosecution of any suit or action at law or in equity in any court within the United States by an enemy or ally of enemy prior to the end of the war, except as provided in section ten hereof: *Provided, however,* That an enemy or ally of enemy licensed to do business under this Act may prosecute and maintain any such suit or action so far as the same arises solely out of the business transacted within the United States under such license and so long as such license remains in full force and effect: *And provided further,* That an enemy or ally of the enemy may defend by counsel any suit in equity or action at law which may be brought against him."

In the recent case of *Ex Parte Colonna* (314 U. S. 510), it was appositely said:

" This provision was inserted in the Act in the light of the principle, recognized by Congress and by this Court, that war suspends the right of enemy plaintiffs to prosecute actions in our courts. See S. Repts. Nos. 111 and 113, pp. 21, 24, 65th Cong., 1st Sess.; *Caperton* v. *Bowyer,* 14 Wall. 216, 236; *Hanger* v. *Abbott,* 6 Wall. 532, 536–37, 539; *Masterson* v. *Howard,* 18 Wall. 99, 105; *Porter* v. *Freudenberg,* (1915) 1 K. B. 857, 866–80. In view of the statute and the opinions in the cases cited, the application will not be entertained. Cf. *Rothbarth* v. *Herzfeld,* 179 App. Div. 865, 867–69, 167 N. Y. S. 199, affirmed 233 N. Y. 578, 119 N. E. 1075."

In *Caperton* v. *Bowyer* (14 Wall. 216), it was said:

" Enemy creditors cannot prosecute their claims subsequent to the commencement of hostilities, as the rule is universal and peremptory that they are totally incapable of sustaining any action in the tribunals of the other belligerent. Absolute suspension of the right to sue and prohibition to exercise it exist during war, by the law of nations  *  *  *."

The circumstance that the stock in plaintiff corporation is held by a British subject residing in England does not affect the plaintiff's status to the extent of cancelling the alien-enemy status. In *Behn, Meyer & Co.* v. *Miller* (266 U. S. 457), it was pertinently said (at p. 472):

" Before its passage the original Trading with the Enemy Act was considered in the light of difficulties certain to follow

disregard of corporate identity and efforts to fix the status of corporations as enemy or not according to the nationality of stockholders. These had been plainly indicated by the diverse opinions in *Daimler Co.* v. *Continental Tyre & Rubber Co.,* 2 A. C. [1916] 307, decided June 30, 1916.

" Section 7, subsection (c), was never intended, we think, to empower the President to seize corporate property merely because of enemy stockholders' interests therein. Corporations are brought within the carefully framed definitions (§ 2) of ' enemy ' and ' ally of enemy ' by the words — ' Any corporation incorporated within such territory of any nation with which the United States is at war [or any nation which is an ally of such nation] or incorporated within any country other than the United States and doing business within such territory.' And we find no adequate support for the suggestion that Congress authorized the taking of property of other corporations because one or more stockholders were enemies."

To permit the nationality and residence of stockholders to dictate the decision in a case of this character would mean that American-owned corporations, incorporated and having their legal residence in enemy territory, would be exempt from the operation of the law. Such a result could make a travesty of the Trading with the Enemy Act in many instances. It is the nationality and residence of the corporation that controls, not that of its stockholders. The corporation is the legal entity that counts. (*Rothbarth* v. *Herzfeld,* 179 App. Div. 865, affd. 223 N. Y. 578.)

Most of the plaintiff's arguments in opposition to the motion were disposed of unfavorably to it in the findings of the arbitrator. Thus, the contention that the plaintiff " at one time " carried on business in France, but discontinued its commercial activities, finds contradiction in the findings. The plaintiff must " stand or fall upon the exact terms of his foreign judgment." (*Sanguinnetti* v. *Roche,* 15 N. Y. S. 185.)

The arbitrator, speaking of the Paris office, found: " I infer that the office has not been closed but has remained open and that there has been sufficient business to warrant the continued attendance of the staff. * * * I infer that they are acting within an authority derived from the situation in which they are placed."

Furthermore, the alleged circumstance that the plaintiff's assets " were all removed from France before the Germans arrived in Paris," does not aid the plaintiff. Even if we assume that the plaintiff's sympathies are with the United Nations —

and the assumption is seemingly justified — the legal status of the plaintiff remains unaltered. The Trading with the Enemy Act makes no distinction between an enemy in law and an enemy in spirit. Sympathies of the persons affected cannot sway the result. Whoever comes within the sweep of the definition is an enemy. That this plaintiff comes within such definition seems to me manifest.

But from the conclusion that the plaintiff occupies the status of an enemy alien, it does not necessarily follow that the complaint should be dismissed. If it would further the purpose of the Act, and not violate its spirit, jurisdiction should be retained to the extent of permitting the action to go to judgment, and the avails — in the event plaintiff recovers — should be released to the Alien Property Custodian.

True, expressions in the above cases exclude entertaining the suit of an enemy alien for any purpose. They hold the issue to be jurisdictional. But the more reasonable doctrine, I think, is to permit the action to proceed to judgment unless that course would grant advantage to the enemy. To put it differently, the test is not solely that of enemy status, but rather the effect of entertaining jurisdiction. This less rigorous and more reasonable doctrine finds enunciation in up-to-date cases. And even the harshness of the old English common-law cases has been relaxed in England.

The significant case of *Ex Parte Kawato,* decided by the Supreme Court of the United States on November 9, 1942 (317 U. S. 69), deals with the rights of a resident enemy alien. Nevertheless, in the course of its opinion, the Supreme Court appositely observed: " Even if petitioner were a nonresident enemy alien, it might be more appropriate to release the amount of his claim to the Alien Property Custodian rather than to the claimants; and this is precisely what was done in *Birge-Forbes Co.* v. *Heye,* 251 U. S. 317, 323, \* \* \* in which this Court said that the sole objection to giving judgment for an alien enemy ' goes only so far as it would give aid and comfort to the other side.' "

The fact that the English authorities explicitly permitted the plaintiff to institute and prosecute the arbitration proceedings is in consonance with this course.

While the definition of the Trading with the Enemy Act is inexorable, the purpose of the Act must be kept in sight. It has a rationale. The Act is designed to prohibit and prevent the lending of aid and comfort to the enemy by frustrating the enemy's attempt to garner sinews of war. Confiscation of prop-

erty was not the objective. Whatever hampers our war effort is the target.

In *Petition of Bernheimer* (130 F 2d 396), it was held: " It is not even the case that a suit may not be prosecuted on behalf of an enemy subject even though resident in enemy or neutral territory. Such suits are occasionally allowed to proceed to judgment where adequate measures may be taken to prevent advantage to the enemy. (See *Birge-Forbes Co.* v. *Heye, supra* [251 U. S. 317]; *Propper* v. *Buck,* 178 Misc. 76, 33 N. Y. S. 2d 11, affd. 263 App. Div. 948, 34 N. Y. S. 2d 134; *Weiditschka* v. *Supreme Tent of Knights of Maccabees of the World,* 188 Iowa 183, 170 N. W. 300, 175 N. W. 835; *Geiringer* v. *Swiss Bank Corp.* [1940] 1 All Eng. R. 406 and *White Engineering Corp.* v. *Canadian Car and Foundry Co.* [1940] 43 Quebec Pr. 419.) "

In *Birge-Forbes Co.* v. *Heye* (251 U. S. 317) referred to in *Ex Parte Kawato* (*supra*), Mr. Justice HOLMES, writing for the court said: " There is nothing ' mysteriously noxious ' (*Coolidge* v. *Inglee,* 13 Massachusetts, 26, 37) in a judgment for an alien enemy. Objection to it in these days goes only so far as it would give aid and comfort to the other side."

I cannot perceive that the prosecution of this action to judgment would or could aid or comfort the enemy. On the contrary, our sinews of war might be appreciably augmented thereby. The mischief lurks not in the prosecution of the action to judgment, but in the possible use to which the avails of the judgment might be put. Control the avails and you avert the mischief.

I hold, therefore, (1) that the plaintiff is an enemy alien within the definition of the Trading with the Enemy Act, (2) that the motion to dismiss the action should be denied, (3) that the action may proceed to judgment, but (4) that the proceeds of the judgment, if and when obtained, be delivered to the Alien Property Custodian for such disposition as may later be determined. Settle order.

(On reargument, December 18, 1942.)

Motion by the defendant for reargument is granted. The defendant's thesis is not without cogency or authority. But it impresses me as being entirely too technical, it emphasizes too strongly the literalness of the Trading with the Enemy Act, without according sufficient consideration to its purpose. It is carrying technicality far enough, I think, to hold the plaintiff an enemy alien within the definition of the Act. The record indicates that plaintiff's status is more *de jure* than *de facto*.

I can perceive no possible threat to our war effort in permitting this arbitration award to be reduced to judgment. To hold otherwise would sacrifice substance for form, the spirit for the letter. The distinction advanced by the defendant between the cases cited in the previous opinion as warranting the conclusion reached on the original motion and the present case does not, as I see it, penetrate the heart of the issue.

The defendant's plaint that neither party is satisfied with the previous ruling is understandable. The plaintiff seeks to collect a judgment unhampered by brakes; the defendant wants the plaintiff halted at the threshold.

In a strict sense this is a private litigation involving the two contestants. Yet, in a larger sense, the administration of justice is of public concern. I cannot escape the conviction that the *purpose* of the Trading with the Enemy Act is more paramount than a narrow, pinched interpretation of it, that this plaintiff is not spiritually an enemy alien, and that no possible danger to the prosecution of the war can result from allowing the action to proceed to judgment. What would be gained for the Government by dismissing the action or suspending its prosecution for the duration of hostilities, I am unable to fathom. To do so would merely pay idle obeisance to formalism without contributing one iota toward justice. To cleave to form just for the sake of form, when to do otherwise would be more in consonance with justice, is a concept to which I cannot subscribe. Hairsplitting does not enhance the value, dignity, or efficacy of the judicial process. *Cessante ratione, cessat ipsa lex.* When the reason for a rule of law ceases, the law ceases. To be sure, if every judge set up his own conception of law, disorder, if not chaos, would ensue Adherence to precedent is essential to an orderly administration of justice. But I am convinced that in the conclusion reached precedent is not being lacerated; rather, there is ample authority for allowing the action to proceed to judgment. Accordingly, the original decision is adhered to. Order signed.