## JAPANESE GOVERNMENT v. COMMER-CIAL CAS. INS. CO. et al.

United States District Court,
S. D. New York.

Nov. 20, 1951.

244

Ira J. Schuster, New York City, for plaintiff.

Duer, Strong & Whitehead, New York City (Harman Hawkins, New York City, of counsel), for defendants.

RYAN, Judge.

Suit has been filed by the Japanese Government against Andrew G. W. Frederick, doing business as Frederick Mahogany Company, for breach of contract and fraud and misrepresentation, and against Commercial Casualty Insurance Company on a bond executed by it guaranteeing, in part, the faithful performance by "Frederick" of the contract in suit.

Defendants, prior to answer, move to dismiss the complaint, urging "that the complaint fails to state a claim against the defendants upon which relief can be granted in that plaintiff was at the time of the commencement of the action a non-resident alien enemy," and "that the Court lacks jurisdiction because the plaintiff was at the time of the commencement of the action a non-resident alien enemy and was not a government recognized by the government of the United States." We have accepted the motion as one made under Rule 56, Fed.R.Civ.P., 28 U.S.C.A., for summary judgment, and all parties have been given opportunity to present material pertinent to the capacity of the Japanese Government to sue as plaintiff in this court on the subject matter of this action.

The question presented by this motion is whether the Japanese Government may maintain this action for alleged breach of the contract made by it with Frederick in Japan on April 21, 1949, which contract was approved by the Supreme Commander for the Allied Powers. We hold that it may.

The complaint alleges that on or about April 21, 1949, the plaintiff and defendant Frederick entered into a written contract for the sale by the latter and purchase by

plaintiff of a certain quantity of Yucatan, Mexico, mahogany lumber of specified grade and dimension, to be shipped "dry", at a total purchase price of $166,470; and, that Frederick undertook to have the lumber inspected and examined at the time of delivery and a certificate issued by an impartial inspector as to size and quality. It is further alleged that the contract was made on plaintiff's behalf by Boeki Cho (Board of Trade), an agency of the Japanese Government, and that the contract was validated by the Supreme Commander for the Allied Powers and became effective on April 21, 1949. It further alleges that "Commercial" executed its bond in the amount of 20 per cent. of the contract price to secure the faithful performance of the contract by Frederick. Plaintiff also alleges that in accordance with its contract it established an irrevocable letter of credit in favor of Frederick in the amount of $183,200 with a prime bank, available against Frederick's sight drafts on the issuing bank, and that Frederick drew on it for two separate deliveries in the total amount of $113,356.54 against invoices and certificates of inspection. The complaint further alleges that the lumber was not inspected as provided for by contract prior to delivery and that it was not as represented nor in accordance with the contract, to plaintiff's aggregate damage of $33,294 with interest on the first delivery and of $41,581.44 with interest on the second delivery. Judgment is sought by plaintiff against Frederick for the total of these amounts and against Commercial for $33,294 and interest, the amount of its bond.

■■ We take judicial notice that war was declared upon Japan by the United States on December 8, 1941, Declaration of War Against Japan, 55 Stat. 795, 50 U.S.C.A.Appendix note preceding Section 1, and that the proclamation ending hostilities provided that the state of war continued to exist, Proclamation of the End of Hostilities, No. 2714, 12 Fed. Reg. 1, 50 U.S.C.A.Appendix, § 601 note. This state of war will continue, unless the President proclaims an earlier date, until a peace treaty is ratified by the Senate of the United States and ratifications have been exchanged. Trading with the Enemy Act, 50 U.S.C.A.Appendix, § 2. The recent treaty signed by representatives of the United States Government and the Japanese Government on September 8, 1951 has not as yet been ratified. There has been no presidential proclamation declaring the war ended. Since the cessation of actual hostilities in September, 1945, between the Allied Powers and the Japanese, Japan has been occupied by the Allied Powers and the Supreme Commander for the Allied Powers has had complete supervision and direction of the Japanese Government. The United States was one of the Allied Powers participating in the appointment of the Supreme Commander and agreeing to his authority.

■■ We take judicial notice also that the armed forces of the United States did not enter Japan as conquerors to levy and exact tribute or to ravish and lay waste the homeland of a defeated people. It has been declared policy of the United States to rehabilitate and re-establish Japan as one of the nations of the world to the end that it should ultimately take its place among the family of democratic nations, where the natural rights and dignity of man are protected and preserved. Japan was and has continued to be occupied, not for purposes of subjugation, annexation or destruction. The occupation has been, essentially, provisional and temporary; Japan has continued as a sovereign with its rights and powers of sovereignty limited only by the directives of the Supreme Commander.

For the purposes of this motion, we accept the facts pertaining to the contract in suit and to this litigation, set forth in the complaint as well as in the letter of the Department of State, dated October 4, 1951, (copy of which is annexed hereto, 101 F.Supp. 250). It is sufficient to here note that the contract in suit and the bond given by Commercial were specifically "approved" by the Supreme Commander and that the filing of this suit was likewise authorized by the Supreme Commander.

246

We also accept as the fact (as appears in the letter of the Department of State, dated October 4, 1951), that

" * * * it has been the policy of the United States Government since the end of hostilities to encourage and to authorize and to permit United States nationals to enter into contracts with Boeki Cho to buy or sell wares and merchandise if such transactions were approved by the Supreme Commander since such trade was necessary for the economic stabilization of Japan;" and,

"that since the end of hostilities, the Allied Powers, of which the United States was one, through the Supreme Commander, encouraged exports from and imports to Japan and the accumulation of dollar balances as the result thereof in order to assist Japan in the redevelopment of her international trade and thereby to reduce the requirement for aid from the United States Government from appropriations for government and relief in occupied areas."

We also accept the statement that the contract in suit, "Contract JI–40239 referred to above did not give aid and comfort to the Japanese Government in the prosecution of any war effort against the United States but on the contrary was entered into pursuant to the policy of the United States Government to encourage trade between the Japanese Government and United States nationals and that the said contract was not opposed to any interests of the United States Government." (letter of Oct. 4, 1951)

We have then an action filed on August 17, 1951, after cessation of hostilities but before the signing or ratification of a treaty of peace, and asserted claims based upon a contract approved on April 21, 1949 by the Supreme Commander for the Allied Powers.

 It is settled that friendly foreign governments are not to be denied the privilege of suing in our courts. Russian Government v. Lehigh Valley R. Co., D.C., 293 F. 133; Russian Republic v. Cibrario, 235 N.Y. 255, 257, 139 N.E. 259. Whether a foreign government is in fact recognized is a political, not a judicial question. When recognition, even for the limited purpose of granting it permission to function and trade as a foreign government with our nationals and within our borders, has been granted by the political departments of our government, it is not for the judiciary to create barriers which thwart and defeat such action. Although the courts are "free to draw for themselves its legal consequences in litigations pending before them", Guaranty Trust Co. v. United States, 1937, 304 U.S. 126, 138, 58 S.Ct. 785, 791, 82 L.Ed. 1224, the action of the political departments of the Government in recognizing a foreign government is conclusive.

 "That at the time of the commencement of this action the Japanese Government was a sovereign government recognized as such by the Government of the United States," we are informed by the letter of the Department of State of October 4, 1951 (annexed hereto 101 F.Supp. 250). With the recognition of the Japanese Government by the United States there goes acknowledgment that it "will be permitted to hold its place and rank, in the character of an independent political organism." Moore, International Law Digest, Vol. 1, p. 72. That "the government of Japan does not have diplomatic representation in the United States and consequently it does not have an ambassador in this country" and that the Japanese Government does not have "consular representation per se," or "any consular offices in the United States," (letter of Department of State, September 14, 1951, annexed hereto 101 F.Supp. 249), does not alter its status as a sovereign government recognized as such by the United States government. Recognition as a sovereign government may, and not infrequently does, exist independently and in the absence of diplomatic representation.

 The right of any foreign government to sue in our courts, in the absence of treaty granting that right, is based upon the theory of international comity. "It pre-supposes friendship. It assumes the prevalence of equity and justice. * * *

We do justice that justice may be done in return." Russian Republic v. Cibrario, supra, 235 N.Y. 258, 139 N.E. 260. At the time of the filing of this suit, August 17, 1951, the Japanese Government had no right granted by treaty to sue in this court; to sustain this right now we must look to the principles of comity, equity and justice. We do so and conclude that the right should not be denied.

. We have reached this conclusion notwithstanding the fact that the treaty ending the state of war between the United States and Japan has not yet been ratified. It does not seem improper to set one time as the date of the end of war for purposes of trading between the nationals of the two countries, another for purposes of terminating wartime legislation, another for purposes of applying American municipal law and still another for some international situations. War Between United States and Germany, Manley O. Hudson, 39 Harv.L. Rev. No. 8, 1045, June, 1926.

 It is recognized that under common law an. alien enemy, whether resident or not, might not maintain an action in our courts, but "The ancient rule against suits by resident alien enemies has survived only so far as necessary to prevent use of the courts to accomplish a purpose which might hamper our own war efforts or give aid to the enemy." Ex parte Kawato, 317 U.S. 69, 75, 63 S.Ct. 115, 118, 87 L.Ed. 58.

This rule has continued with respect to nonresident enemies and the suspension of their rights to prosecute actions in our courts. Johnson v. Eisentrager, 339 U.S. 763, 776, 70 S.Ct. 936, 94 L.Ed. 1255; Ex parte Colonna, 314 U.S. 510, 62 S.Ct. 373, 86 L.Ed. 379. The measure of this suspension of rights is to be found in our common law as it is modified by statute.

The Japanese Government is deemed, for purposes of this decision, a non-resident, alien enemy (Trading with the Enemy Act, supra), and, therefore, subject to all the disadvantages of that status. However, in the common law even there were at times exceptional instances where the rule was relaxed. Thus, in Sanderson v. Morgan, 39 N.Y. 231, the Court of Appeals wrote, "In Mrs. Alexander's [Cotton] case (2 Wall. 404 [17 L.Ed. 915]) it was held, that all the people of any district that was in insurrection against the United States in the late rebellion were to be regarded as enemies, except in so far as, by action of the United States government itself, that relation may have been changed."

The rule was applied "save in exceptional instances, as, for example, where commerce is continued between the nations at war". Stumpf v. A. Schreiber Brewing Co., D.C., 242 F. 80, 82.

It seems to us that the decision of Justice Washington in Crawford v. The William Penn, 6 Fed.Cas. page 778, 779, No. 3372, affords an indication of the extent and scope of the exceptional instances in which suit was allowed to be filed. There, a libel was filed for repairs to a vessel chartered by the United States to carry American prisoners of war in the War of 1812 from Jamaica to the United States. The vessel had cleared Jamaica when it was forced to put back for repairs and refitting. Libelants, English subjects, resident in Jamaica, made these repairs. Replication to the libel was filed by claimants alleging that libelants being alien enemies, residing in Jamaica, could not file suit here because England and the United States were then at war. Justice Washington noted the common law rule preventing suits by alien enemies during time of war, but observed that the voyage of The William Penn had been authorized under the rules of war by both belligerents for the transportation of prisoners to the United States and that the repairs to the vessel were made in furtherance of this purpose and to benefit the United States. Justice Washington refused to dismiss the libel, and wrote: " * * * if the contract on which the suit is brought, arise directly or collaterally out of a trade licensed by the sovereign authority of the government, in whose courts redress is sought, enemy interest in the subject in controversy, will not defeat the action depending in the name of the subject as trustee. * * * the end being licensed, the ordinary legitimate means of attaining that end, is considered as being also licensed. * * * where commerce is per-

mitted amongst enemies, contracts, and actions founded upon them, are permitted; 'for who,' (Bynkershoek) asks, 'will sell and carry goods to an enemy, without the right of recovering the price of them? and what hope can there be of recovering that price, if one cannot judicially compel payment from his enemy purchaser.' In cases of this nature, in courts proceeding according to the civil law, the only question is, has the plaintiff a persona standi in judicio? Can he be heard as a plaintiff in that court? Bynkershoek, in the above quotations, gives the answer. The right to sue, and to compel payment, is a necessary incident to his right to trade and to contract. This doctrine of Bynkershoek, has received the entire approbation of Sir William Scott, in the case of The Hoop, in which he gives the sense of that learned jurist as amounting to this, that the legality of commerce, and the mutual use of courts of justice, are inseparable. 1 C.Rob.Adm. 168."

Although Justice Washington writes of the contract upon which suit was filed as arising "out of a trade licensed by the sovereign authority of the government, in whose courts redress is sought," we read it not as a "license" in the very formal sense in which we have grown to accept the term, but rather as a permission or an act done with governmental sanction, authority and approval. In this sense the contract, then before the court, was the same in character as the contract in the instant suit; in law, the exchange of prisoners of war is no more an incident of warfare than the maintenance of the land of the enemy by the victorious military forces occupying it. The achievement of an honorable and lasting peace is the ultimate aim of any civilized nation at war; it was to accomplish this end that the contract in suit was approved and validated by the Supreme Commander.

 The basic reason, at common law, for denying access to our courts as plaintiffs to nonresident, alien enemies was that not to do so might give aid and comfort to the enemy. The contract in suit did not give such aid or comfort; it was approved pursuant to the policy of the United States Government which encouraged its making.

It cannot be said that this contract is void as against public policy. This suit could have been maintained at common law; we now consider whether it is prohibited by statute. We conclude that it is not.

The Trading with the Enemy Act, supra, "was passed with its declared purpose 'to mitigate the rules of law which prohibit all intercourse between the citizens of warring nations, and to permit, under careful safeguards and restrictions, certain kinds of business to be carried on.'" Ex parte Kawato, supra, 317 U.S. 76, 63 S.Ct. 119, 87 L.Ed. 58.

The licensing powers in Sections 3, 4 and 5 of the Trading with the Enemy Act are granted to the President of the United States, who has under Section 3(a) and Section 5(b) delegated these powers to the Secretary of Treasury and the Alien Property Custodian. Memorandum of President, dated February 12, 1942, 7 Fed.Reg, 1409, See note following 50 U.S.C.A.Appendix, § 3; Executive Order No. 8389, April 10, 1940, 5 Fed.Reg. 1400, as amended, note following 12 U.S.C.A. § 95a; and Executive Order No. 9095, Mar. 11, 1942, 7 Fed.Reg. 1971, as amended, note following 50 U.S.C.A.Appendix, § 6. We are not informed that the President has delegated his licensing powers to the Supreme Commander.

 However, the contract in suit not being prohibited under common law required no license under the Act. Cf. Ex parte Kawato, supra. The approval and authorization of the contract was an act by the Commander of the allied forces in the occupied land of a people with whom a treaty of peace was under negotiation. There was implicit in the action of the United States in joining in the designation of the Supreme Commander a grant of power to him to do all acts necessary to military occupation. The contract was approved in the accomplishment of this purpose. It was a military act done by an agent of the President as Commander-in-Chief in time of war. It must be respected and enforced by our courts.

Motion denied; let defendants answer in twenty days from date hereof.

Address Official Communications to
THE SECRETARY OF STATE
Washington 25, D. C.

**DEPARTMENT OF STATE**
WASHINGTON

September 14, 1951

My dear Mr. Hawkins:

Reference is made to our telephone conversation of September 11, 1951, and to one between Mr. A. G. W. Frederick and yourself and Mr. Gerald Warner, Officer in Charge of Japanese Affairs, held on the same date, on behalf of the Commercial Casualty Insurance Company of New York City, in which it was requested that a written statement be made by the Department of State in reply to two specific questions, namely (1) Does Japan have an Ambassador in the United States?, and (2) What type of consular representation does the government of Japan have in the United States?

The answers to these two questions are as follows:

(1) The government of Japan does not have diplomatic representation in the United States and consequently it does not have an ambassador in this country, as of this date.

(2) With regard to consular representation *per se,* the Japanese Government at this time does not have any consular offices in the United States. However, some of the duties normally performed by consular offices are performed by Japanese Government Overseas Agencies. These Agencies were established in the United States early in 1950, at the invitation of our Government, in order to promote trade relations between the United States and Japan and to handle quasi-consular functions, including citizenship and property problems relating to Japanese nationals residing in the United States. Six such Agencies have been established in the United States to date: namely, New York, Washington, San Francisco, Seattle, Los Angeles and Honolulu. The New York office of the Japanese Government Overseas Agency is located in room 4207 of the Lincoln Building, 60 East 42nd Street, New York 17, New York (MU 2-5395) and the chief of the Agency is Mr. Kohei TERAOKA. For your information I am enclosing a list of the functions of these Agencies and the limitations to which they are subject.

Sincerely yours,

Assistant Legal Adviser
Conrad E. Snow

Enclosure:
List of Agency functions.

The functions of the Japanese Government Overseas Agencies comprise the following items:

1. Promotion of Trade
 a. Promotion of trade between the United States and Japan.
 b. Research on market conditions and trade opportunities in the United States.
 c. Extending good offices and answering trade and travel inquiries.
 d. Transmission of information to Japan concerning local commercial procedures and regulations.
 e. Making available to local businessmen information concerning Japanese laws and regulations governing import-export customs, exchange control, investments and other similar matters.
 f. Displaying samples and exhibits of Japanese manufactures and providing information on trade opportunities in Japan.
 g. Supplying tourist information.

2. Affairs Pertaining to Japanese Nationals and Property

 a. Disposal of matters pertaining to the retention and renunciation of Japanese nationality.

 b. Handling of notifications of birth, death, marriage, and other changes of status or name requiring recording in Japanese family registers.

 c. Drawing up documents in accordance with Japanese legal requirements and administering oaths relating to Japanese civil status or property matters.

 d. Protection and administration of property of deceased Japanese nationals in so far as such action is in conformity with state laws.

 e. Bringing to the attention of local Japanese nationals all Japanese laws and regulations, as well as SCAP regulations, with which Japanese nationals residing in the United States might be directly concerned.

These Agencies are operated under the supervision of and report directly to the Japanese Foreign Office subject to the following limitations:

1. The Japanese Overseas Representatives shall not act in a diplomatic or quasi-diplomatic capacity. They are to refrain from engaging in propaganda activities and from direct representation functions such as acting on behalf of the Japanese Government in making representations to the United States authorities, except in so far as the administrative conduct of the Agencies themselves may require.

2. The Representatives shall have no consular titles or immunities; they shall receive no exequatur; they shall not use codes other than standard commercial codes; they are not to interpose with the local authorities for the protection of any Japanese nationals beyond making courteous inquiry to local officials; and they shall have no jurisdiction in controversies involving seamen.

Address Official Communications to
**THE SECRETARY OF STATE**
Washington 25, D. C.

## DEPARTMENT OF STATE
### WASHINGTON

In reply refer to L/FE

 October 4, 1951

My dear Mr. Schuster:

 Reference is made to your letter of September 12, 1951 relating to the case entitled "The Japanese Government, plaintiff, against Commercial Casualty Insurance Company and Andrew G. W. Frederick, doing business as Frederick Mahogany Company, defendants". You request certification for presentation to the Court of certain facts.

 In reply, you are informed

 that at the time of the commencement of this action, the Japanese Government was a sovereign government recognized as such by the Government of the United States;

 that the Supreme Commander for the Allied Powers (SCAP) was appointed, authorized and directed by the Allied Powers concerned with the occupation of Japan to direct and control the acts and conduct of the Japanese Government and of Japanese nationals;

 that the United States Government was one of the Allied Powers and participated in the appointment of, direction and authorization to SCAP as above set forth;

 that all hostilities between the Government of Japan and the Allied Powers including the Government of the United States ceased in September, 1945.

The Department has been informed by the Supreme Commander for the Allied Powers

that pursuant to the authority vested in him by the Allied Powers the Supreme Commander directed on April 3, 1946 that all Japanese foreign trade transactions be handled through and by Boeki Cho, an agency of the Japanese Government (for which the Miti was authorized by the Supreme Commander to be substituted on June 4, 1949), that such transactions of Boeki Cho be handled in accordance with instructions from the Supreme Commander and that Boeki Cho take delivery of all goods imported into Japan as instructed by the Supreme Commander;

that the Supreme Commander authorized the purchase by Boeki Cho from the Frederick Mohogany Company of 480,000 board feet of Mexican mahogany lumber;

that pursuant to such authorization Boeki Cho entered into contract number JI–40239, April 21, 1949, and that said contract was approved by the Supreme Commander on the same date;

that the performance bond furnished by the Commercial Casualty Insurance Company in connection with this contract was also approved by the Supreme Commander;

that on the arrival in Japanese ports of the lumber delivered by the Frederick Mahogany Company, the Supreme Commander directed Boeki Cho to take delivery thereof and payment was made by the Supreme Commander from commercial accounts at the contract price in United States dollars;

that notice of claim was filed by the Supreme Commander;

that the pending suit to recover damages for breach of contract JI–40239 was authorized by the Supreme Commander;

that at the time the pending action was commenced and some time prior thereto, the Japanese courts were in full operation and acting under the authority of the Supreme Commander and that all claims by non-occupation United States nationals against the Japanese Government or any agency or subdivision thereof were enforcible in the Japanese courts;

that since the end of hostilities, the Allied Powers, of which the United States was one, through the Supreme Commander, encouraged exports from and imports to Japan and the accumulation of dollar balances as the result thereof in order to assist Japan in the redevelopment of her international trade and thereby to reduce the requirement for aid from the United States Government from appropriations for government and relief in occupied areas;

that it has been the policy of the United States Government since the end of hostilities to encourage and to authorize and to permit United States nationals to enter into contracts with Boeki Cho to buy or sell wares and merchandise if such transactions were approved by the Supreme Commander since such trade was necessary for the economic stabilization of Japan;

that contract JI–40239 referred to above did not give aid and comfort to the Japanese Government in the prosecution of any war effort against the United States but on the contrary was entered into pursuant to the policy of the United States Government to encourage trade between the Japanese Government and United States nationals and that the said contract was not opposed to any interests of the United States Government.

Sincerely yours,

For the Secretary of State:

Conrad E. Snow
Assistant Legal Adviser