Kurt SCHMIEDER, Plaintiff-Appellant,

v.

Louis H. HALL, as Executor of the Estate of Helen B. Dwyer, Defendant-Appellee.

Nos. 85, 86, 87, Dockets 75–7696, 76–7038, 76–7264.

United States Court of Appeals, Second Circuit.

Argued Sept. 1, 1976.

Decided Sept. 20, 1976.

James P. Duffy, III, New York City (Werner Galleski, New York City, Thomas A. Illmensee, Lake Success, N. Y., Robert H. Reiter, Washington, D. C., Richard L. Medverd, Boston, Mass., of counsel), for plaintiff-appellant.

John S. Martin, Jr., New York City (Morton Turchin, New York City, of counsel), for defendant-appellee.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City (Frederick P. Schaffer, Asst. U. S. Atty., New York City, of counsel), filed a suggestion of interest for the United States Government urging affirmance.

Before KAUFMAN, Chief Judge, and FEINBERG and VAN GRAAFEILAND, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

"As a litigant," said Learned Hand, "I should dread a lawsuit beyond almost anything else short of sickness and death."[1] This thought must have often recurred to these parties, who have been locked in combat since 1969, seeking to resolve a controversy whose roots extend over 40 years into the past. Because we agree with Judge Knapp's able opinion disposing of Herr Schmieder's attempt to impose a constructive trust on certain assets given by him to Mrs. Helen Dwyer in 1938, our primary duty is to determine whether this judgment precludes an action grounded in the very same transaction but invoking an entirely novel legal theory. Since we believe the initial judgment bars any later action based on the same set of events, we are pleased, hopefully, to free these parties from the toils of litigation and grant repose.

I.

The facts are fully set forth in Judge Knapp's opinion and need but brief summa-

---

1. L. Hand, Deficiencies of Trials to Reach the Heart of the Matter, 3 Lectures on Legal Topics, Assn. Bar City of N. Y. 89, 105.

ry here. In 1928, Schmieder, a German national, received about $250,000 in settlement of his father's World War I claims against the American government, arising out of the seizure of a New Jersey textile factory owned by Schmieder's family. This sum was deposited in the New York Trust Co., and, although subject to German property taxes, was not reported at this time to the Weimar Republic. In 1932, however, on the eve of the Nazi takeover, Schmieder divided his American assets into two parts. The smaller, about one-third of the total, he reported to the German authorities, while the larger portion continued to be held clandestinely in the United States.

The Third Reich enacted increasingly harsh penalties for those who hid property abroad, and Schmieder was forced to take ever more stringent precautions against detection of his American holdings. Accordingly, in 1934 he transferred legal title to his sister-in-law, Jenny Bochmann, who was a Swiss citizen. And two years later he directed his American lawyer, Louis Hall, Sr., to set up Stoneleigh Corp. to hold Mrs. Bochmann's assets. By 1937, however, the risk of holding unreported assets was such that Mrs. Bochmann, who had family in Germany, desired to sever completely her connection with Schmieder's scheme.

Hall advised Schmieder that his property could not be held in the United States with the identity of the true owner concealed. Since the assets could not be taken to Germany, the only remaining course, Hall stated, was to give them away. Schmieder was understandably reluctant to take this step, but his hesitation disappeared when the Nazi authorities called him in for questioning about his foreign holdings.

Not long after, and most likely because the penalty for concealing property held abroad included death, Schmieder delegated Hall and William Graupner, a friend who had been acting as an intermediary between Schmieder and his American lawyer, to select a donee. The two men chose Helen Dwyer, Hall's personal secretary. Mrs. Dwyer was an orphan whose husband had become mentally deranged and who was herself in poor health. Hall and Graupner felt that her misfortunes made her a deserving recipient of Schmieder's largesse. Hall drew the appropriate papers, and Schmieder, having been expressly informed by Graupner that the gift must be absolute, "with no strings attached," wrote on a slip of paper: "I am in agreement with the arrangement which we have discussed for my sister-in-law." Mrs. Bochmann formally made the gift in 1938. The value of the property was then $120,000.

A cloud again passed over these ill-starred assets in October, 1941, when the United States, looking forward to the possibility of war, required registration of property held by American citizens on behalf of foreign nationals. On the advice of George Z. Medalie, a prominent attorney, Mrs. Dwyer reported the facts surrounding the gift. Twenty months later, on June 30, 1943, the United States Government blocked the accounts containing the gift property. During the succeeding five years Mrs. Dwyer repeatedly applied for licenses to use some of the funds and for unblocking. Moreover, she consistently maintained the gift was genuine and irrevocable and that she was not holding the property on anyone else's behalf. These pleas fell on deaf ears, however, and in December, 1948, the Alien Property Custodian issued an order vesting all the property Mrs. Dwyer had received from Jenny Bochmann in the United States.[2]

Mrs. Dwyer promptly commenced an action seeking return of the property. In this connection, on June 1, 1948, Schmieder signed a statement declaring:

> The undersigned confirms herewith that it is understood by him that the gift of Mrs. Bochmann's bank balance with the New York Trust Company and of securities deposited there to Mrs. Dwyer is a voluntary, absolute and irrevocable gift, without any obligation of Mrs. Dwyer.

Two years later, in 1951, the United States, in settlement of the suit, returned 55% of

---

2. The order was issued under the Trading with the Enemy Act, 50 U.S.C.App. §§ 1 et seq.

the seized assets. And so the matter stood until 1969, when Schmieder began the first of the two lawsuits involved in this appeal.[3]

The essence of Schmieder's claim in both lawsuits is that Mrs. Dwyer, or her legatee, should not be permitted to avail herself of his distress in 1938 to keep the fortune he then gave her to avoid the threat of execution by the Nazis. In the 1969 action Schmieder clothed this underlying idea in the language of fraud. He asserted that he made the gift as a result of a gentlemen's agreement between himself and Hall, Sr. that the property would be returned to him when the "emergency" passed. In reliance on this misrepresentation, he asserts, he gave his American assets to Mrs. Dwyer, who shortly thereafter willed the fortune to members of Hall's family. The effect of this, Schmieder insists, is that Hall prevailed upon his client to give the property to himself.

Judge Knapp rejected this argument on two grounds. Since any claim Schmieder might assert must have arisen out of events that occurred in 1938, Judge Knapp decided that any interest Schmieder might have had in the gift assets was vested in the United States by the 1948 order. Accordingly, the Judge said, the appellant lacked standing to subject Mrs. Dwyer's property to any claims whatever. In any event, Judge Knapp decided, Schmieder gave his American fortune away to guarantee his own safety, and the gift was "without obligation" to Mrs. Dwyer and made without any misrepresentation to Schmieder. The Judge also found that Hall and Mrs. Dwyer had not conspired to bring the Schmieder fortune into Hall's family. Based on these findings, Judge Knapp concluded that Schmieder was not induced to give the fund to Mrs. Dwyer by fraud.

Undaunted by this decision, Schmieder on January 30, 1976, commenced a new action, inspired by the same intuition of unfairness, but asserting an obligation under federal common law [4] and general equitable principles requiring Mrs. Dwyer's executor to restore the gift to him. Judge Knapp dismissed the new complaint as res judicata. Noting that his previous opinion had held "plaintiff had no standing in law or equity or otherwise to challenge defendant's possession of the property received as a result of the settlement of her suit against the government" and "assuming such standing, plaintiff had not established entitlement to the monies in question on the ground of fraud (equitable or other), unjust enrichment or otherwise," Judge Knapp concluded that, if either of these grounds were affirmed on appeal, Schmieder would be forever foreclosed. Because we agree with Judge Knapp's conclusion and reasoning, we shall add only a few brief comments.

---

**3.** Mrs. Dwyer died the day the complaint was served, and two years later, on August 24, 1971, her executor and principle legatee, Louis Hall, Jr., was substituted as defendant.

Schmieder also appeals the denial of his motion under Fed.R.Civ.P. 60(b) for relief from judgment, and, in addition, moves to vacate Judge Knapp's judgment in the 1969 suit and his orders of December 11 and 22, denying relief from judgment and rehearing. The gist of his argument, both on the appeal and with respect to the motion to vacate, is that Judge Knapp's opinion leaves the scope of the judgment uncertain. Schmieder concedes that our decision on the res judicata effect of the 1969 suit governs his appeal of the denial of relief from judgment. Appellant's brief at 42. The motion to vacate is in pari materia with this appeal, and, in view of our disposition of this case, must be denied.

**4.** Schmieder asserted the novel theory of "windfall abuse," the core of which is the federal policy forbidding private litigants from standing in the place of the government in asking that the rights of enemy aliens be abrogated. See Ex parte Kumezo Kawato, 317 U.S. 69, 75, 63 S.Ct. 115, 87 L.Ed. 58 (1942) (Japanese seaman may sue in admiralty to recover unpaid wages.) It is hard to understand what benefit Schmieder hopes to derive from this theory, since Judge Knapp has already determined that Mrs. Dwyer's property was received from Schmieder as an absolute gift and that, subsequently, the Government seized every interest Schmieder might have had in the subject assets. Of course, we do not have occasion to rule on this issue. But we should observe how thoroughly the factual questions involved in proving "windfall abuse" are intertwined with those resolved against Schmieder in the 1969 action.

II.

"Res judicata is a principle of peace." *Opelousas-St. Landry Securities Co. v. United States*, 66 F.2d 41, 44 (5th Cir. 1933). We cannot underestimate the importance of repose to parties, like those before us, who have been locked in combat for more than seven long years in a dispute whose seed was planted about 40 years ago. But we must also attach fundamental significance to the interest of society and the courts in the final resolution of disputes. The explosion of federal dockets in recent years is so notorious as to require no comment. Judicial resources today are an increasingly scarce commodity, and it is of the utmost importance that litigants use them wisely.

Judicial economy ordinarily demands that the whole controversy between the parties should be brought before the same court in the same action, particularly where the acts complained of and the recovery are the same. *See Williamson v. Columbia Gas & Elec. Corp.*, 186 F.2d 464, 470 (3d Cir. 1950). We should emphasize, therefore, that Schmieder's claim of unjust enrichment, whether grounded in state or federal law, is nothing more than a new legal formulation of the very dispute resolved by Judge Knapp's original decision. The events constituting Schmieder's asserted injury are substantially the same in the two cases. All the facts necessary to support Schmieder's claim in the second action were alleged or could have been alleged in the first. Schmieder merely wishes the opportunity to advance reasons for recovery not presented to or, in Schmieder's view, not adequately considered by Judge Knapp in his initial opinion. To indulge this lavish desire would be an acquiescence in the abuse of the judicial process. *See Williamson v. Columbia Gas & Elec. Corp., supra; Miller v. National City Bank of N.Y.*, 166 F.2d 723, 727 (2d Cir. 1948); *Moreno v. Marbil Productions, Inc.*, 296 F.2d 543 (2d Cir. 1961); Restatement (Second) of Judgments, (T.D. No. 1, March 28, 1973) § 61 comment c at 82–83; 1B J. Moore, Federal Practice, ¶ 0.410[1] at 1160. This we refuse to do, and accordingly, we affirm.