**FARBENFABRIKEN BAYER, A. G.,**
a corporation, Plaintiff,

v.

**STERLING DRUG INC., a corporation,**
Defendant.

**Civ. A. No. 909–55.**

United States District Court
D. New Jersey.

July 21, 1961.

See also 148 F.Supp. 733, 197 F. Supp. 627.

Bailey & Schenck, by Alexander T. Schenck, Newark, N. J., Arnold, Fortas & Porter, by Thurman Arnold and Milton V. Freeman, Washington, D. C., for plaintiff.

O'Mara, Schumann, Davis & Lynch, by Edward J. O'Mara, Jersey City, N. J., Cahill, Gordon, Reindel & Ohl, by John T. Cahill, New York City, for defendant.

WILLIAM F. SMITH, Chief Judge.

This is a civil action in which the plaintiff, a corporation organized under the laws of Germany, asserts four separate but related claims, to wit, first, a claim for profits allegedly due for the years of 1940 and 1941 under a contract; second, a claim to property and funds allegedly appropriated by the defendant; third, and in the alternative, a claim for damages for breach of contract; and fourth, a legal and equitable claim based upon a breach of trust. The action is essentially one to compel an accounting.

The action came before the Court on a motion for the entry of judgment filed by the defendant under Rules 12(c) and 56(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. The hearing on this motion was held in abeyance pending the conclusion of a pretrial conference held by the Court under Rule 16 of the Federal Rules of Civil Procedure, 28 U.S.C.A. The conference resulted in a comprehensive stipulation of facts and an agreement on the relevancy and materiality of eighteen written exhibits. Thereafter the plaintiff filed a counter-motion for summary judgment.

These motions have been argued and are now before the Court for decision. The motions are based on the entire record, which includes the pleadings, stipula-tion, exhibits, and affidavits. The defendant has urged numerous grounds in support of its motion but it is here necessary to consider only the principal ones. It is our opinion that the grounds considered may be dispositive of the litigation.

### Parties

The plaintiff, Farbenfabriken Bayer A. G., hereinafter identified as Farben, is engaged in the development, manufacture and sale of drugs and pharmaceutical products. The plaintiff alleges that it is the lawful successor to Farbenfabriken vorm. Friedrich Bayer and Company, hereinafter identified as Leverkusen. This allegation is denied by the defendant, but for the purpose of the present motions we shall accept it as true. It should be noted that the immediate successor to Leverkusen was I. G. Farbenindustrie, hereinafter identified as I. G. Farben, which succeeded to the business of Leverkusen in 1925.

The defendant Sterling Drug, Inc., hereinafter identified as Sterling, a corporation of the State of Delaware, is engaged in the development, manufacture and sale of drugs and pharmaceutical products. It is the lawful successor to Sterling Products, Incorporated, and the Bayer Company, Inc., a New York corporation, hereinafter identified as Bayer. These corporations were merged on December 31, 1942.

### Facts

#### I

The predecessor of the plaintiff, Leverkusen, in 1894, organized a wholly-owned United States subsidiary, Farbenfabriken of Elberfeld Company, under the laws of New York. This subsidiary, in 1908, was granted registration of the United States trade-marks, to wit, the name "Bayer" and the "Bayer Cross," disposed within a circle. The said predecessor, in 1913, organized two corporations under the laws of the State of New York, to wit, Synthetic Patents Company, Inc., and Bayer. The subsidiary, Farbenfabriken of Elberfeld Company,

was thereafter dissolved, and some of its assets, including the said trade-marks, were transferred to Bayer. The use of the trade-marks by the subsidiary, and later Bayer, was exclusive between 1895 and 1917.

## II

The capital stock of Bayer and of Synthetic Patents Company, Inc., and other assets of Leverkusen, were vested by the Alien Property Custodian on January 15, 1918, after the declaration of war on Germany. The vested assets were sold to the defendant's predecessor at public auction in December 1918, pursuant to the applicable provisions of the Trading with the Enemy Act, and Bayer became the wholly-owned subsidiary of the said predecessor. As hereinabove noted these corporations were merged on December 31, 1942.

## III

After a period of negotiations which extended from August 1919 to October 1920, Leverkusen and Bayer entered into a contract under which the latter acquired the exclusive license to use the trade-marks in connection with the sale and distribution of acetylsalicylic acid (aspirin), and its compounds, in several Latin American countries. This contract contained, in addition to the usual terms and conditions of a license agreement, provisions which governed the sale and distribution of aspirin and aspirin products in the territory.

## IV

Bayer agreed, as part of the consideration, to transfer to Leverkusen those trade-marks registered in the name of Bayer in the Latin American countries, and which, before such registration, had been employed by Leverkusen to designate its products in the same territory. Bayer further agreed to withdraw all pending applications for such trade-marks.

## V

Leverkusen agreed not to issue any license for the use of the trade-marks to any other person or corporation. It further agreed: first, to ship and deliver aspirin and aspirin products only to Bayer; and, second, not to supply to any other person or corporation aspirin or aspirin products for sale in the territory under the trade-marks. The parties agreed "to use their best endeavors to prevent all importation of" aspirin and aspirin products bearing the trade-marks.

## VI

The contract provided that the business and distribution of aspirin and aspirin products was to be conducted solely by Bayer, through agencies appointed or to be appointed by it, except where existing agencies of Leverkusen were in active operation; in such case the latter agencies were to be utilized. There is a further proviso not relevant here. The subsidiary agencies of Leverkusen were utilized in the larger countries, except in Argentina, until 1941. These agencies, whether subsidiaries or independent, received payment for their activities.

## VII

Pursuant to the terms of the agreement, Leverkusen manufactured, sold and delivered all the aspirin required in the territory until some time in 1939. Thereafter, likewise pursuant to the terms of the agreement, Bayer and its successor Sterling, manufactured, sold and delivered all the aspirin required in the territory. The aspirin was imported by the local agencies under the direction and control of Bayer, and the aspirin tablets were manufactured, packaged and sold by them, except in the smaller countries, where the local agencies were engaged solely in the sale of the finished products.

## VIII

The contract, as amended and supplemented, was substantially performed by both parties thereto, and their successors, from its effective date until the summer of 1941, prior to the entry of the decree of September 5, 1941, to which reference is hereinafter made. The total profits were computed and reported to

Leverkusen for each year, including the year 1940, in accordance with the terms of the contract, and 75% of the profits thus computed were remitted to Leverkusen as the funds were collected and received from the countries within the Latin American territory. Bayer retained its share of the profits. The payments to Leverkusen and its successor, I. G. Farben, were made regularly until late in the summer of 1941, immediately prior to the termination of the relationship between them.

### Supplemental Agreement

#### IX

The predecessors of the parties to this litigation, Bayer and Leverkusen, entered into an agreement dated April 1, 1923 (Exhibit B), purportedly intended to settle certain disputes which had arisen between them. It appears that they were then major competitors in the manufacture and sale of drugs and pharmaceutical products. This agreement effected a world-wide division of the drug and pharmaceutical market between Bayer and Leverkusen. They agreed: first, to allocate specific territories to each of them and to a newly formed corporation in which each of them was to have an interest; second, to mutually transfer trade-mark rights with respect to such territories and according to the respective allocations; third, to cooperate to protect each other's markets and to eliminate competition; and fourth, to restrict imports and exports. The terms and conditions of the agreement are summarized in the opinion of Judge Weinfeld in the case of United States v. Bayer Company, D. C., 135 F.Supp. 65, at pages 68, et seq.

### Laboratorios Recalcine
### (Hegemann)

#### X

Prior to 1937 a Chilean Company, Recalcine, was a competitor of Bayer engaged in the sale and distribution of aspirin products under the trade name "Aliviol." Sterling and the immediate successor to Leverkusen, I. G. Farben, agreed in 1937 to purchase the business of the said company, the entire purchase price to be advanced by Sterling. It was further agreed that Sterling and the successor to Leverkusen were to own, respectively, a 25% share and a 75% share of the business.

#### XI

The business was acquired and was thereupon transferred to a newly organized company, Laboratorios Hegemann y Cia., hereinafter identified as Hegemann. Between 1937 and 1941, Messrs. Pando and Hegemann, as nominees of Sterling, and with the consent and approval of I. G. Farben, were the registered record owners of 75% and 25%, respectively, of the capital stock of the newly organized company.

#### XII

The entire purchase price for the said business was advanced by Sterling. This advance was made pursuant to an agreement under which I. G. Farben's share of the purchase price, equal to 75% of its share in the business, would be repaid to Sterling out of its share of the profits of the "Aliviol" business and its share of the profits from the sale of aspirin and aspirin products in Chile under the 1920 contract. It is stipulated by the parties that by 1940, I. G. Farben's accrued shares of the profits were sufficient to satisfy the advance made on its behalf by Sterling.

### Laboratorios Suarry
### (Suarry)

#### XIII

Prior to 1937 an Argentinian company, Suarry, was also a competitor of Bayer engaged in the sale and distribution of aspirin products under the trade name "Geniol." These products were marketed in Argentina and other South American countries. Pursuant to an agreement similar to that under which the business of Recalcine was acquired, Sterling purchased 51% of the capital stock of Suarry and advanced the full amount of the purchase price. The stock certificates were in bearer form and were deposited

with the National City Bank of New York, Buenos Aires Branch, in an account in the name of Sterling.

## XIV

Pursuant to a letter of agreement dated April 19, 1938 (Exhibit D), Sterling purchased additional shares of the capital stock of Suarry and advanced the full amount of the purchase price. The stock certificates were in bearer form and were deposited with the National City Bank of New York, Buenos Aires Branch, in an account in the name of Sterling.

## XV

The purchases of the capital stock in Suarry were made pursuant to an agreement under which I. G. Farben's share of the purchase price, equal to 75% of its interest in the business, would be repaid to Sterling out of its share of the profits of the "Geniol" business and its share of the profits from the sale of aspirin and aspirin products in Argentina under the 1920 contract. It is stipulated by the parties that by September 5, 1941, I. G. Farben's accrued shares of the profits were not sufficient to satisfy the advance made on its behalf by Sterling.

### Termination of the Relationship

## XVI

The representatives of Sterling, on August 13, 1941, met with the Interdepartmental Committee, a committee consisting of representatives of the Departments of State, Treasury and Justice. It was after this meeting that Sterling, on August 14, 1941, cabled the successor to Leverkusen, I. G. Farben, as follows: "Present and proposed governmental restrictions make it necessary that we terminate our joint Latin American business enterprises while conditions still permit our doing so on negotiated basis. * * *. The aim and purpose is to dissolve all contracts, agreements, understandings, partnerships, and to divide jointly-held property and to terminate all obligations and rights resulting from 1920 Latin American agreement." Ex-

hibit F. The cable contained a proposal relating to the dissolution of the existing relationship and the division of the jointly-held property. The proposal was rejected by I. G. Farben (Exhibits H and J).

## XVII

A civil action to enjoin alleged violations of the antitrust laws was commenced by the United States of America under Section 4 of the Sherman Act, 15 U.S.C.A. § 4, on September 5, 1941. The complaint charged generally that Sterling, Bayer, and others had been engaged in "an unlawful combination and conspiracy to restrain trade and commerce in pharmaceutical products among and between the several states of the United States, the District of Columbia and with foreign nations," in violation of Section 1 of the Sherman Act, 15 U.S. C.A. § 1. The complaint alleged specifically that the contracts of 1920 and 1923, and others, were in furtherance of "the unlawful combination and conspiracy." See Paragraph 15 of the complaint, Exhibit M.

## XVIII

The complaint alleged further: "The effect and result of the combinations, conspiracies and agreements hereinbefore alleged have been to give to I. G. Farben, its subsidiaries, affiliates or assigns the exclusive right to manufacture pharmaceutical products for the South and Central America and Mexican trade, to give to I. G. Farben, its subsidiaries, affiliates or assigns * * * seventy-five (75%) of the profits of Bayer from the sale of aspirin in South and Central America and Mexico, and otherwise to restrain interstate and foreign trade in pharmaceutical products." The exclusive right to manufacture pharmaceuticals did not include the exclusive right to manufacture aspirin for the Latin American market. See the 1920 contract. I. G. Farben was the successor to Leverkusen.

## XIX

A final judgment was entered on the consent of the defendants on September

5, 1941. The final judgment contained the following pertinent provisions:

"III. 1. The Latin American contract dated October 28, 1920, between The Bayer Company, Inc. and Farbenfabriken vorm. Friedr. Bayer & Company [I. G. Farbenindustrie A. G. (its successor)] and all agreements amendatory or supplemental thereto between said parties are hereby adjudged and declared to be unlawful under the Anti-Trust Laws of the United States, and defendant The Bayer Company, Inc. is enjoined and restrained, subject to the provisions of Paragraph III (2) hereof from the further performance of any of their provisions.

"2. The defendant The Bayer Company, Inc. is ordered and directed to terminate prior to December 31, 1941 all arrangements with I. G. Farbenindustrie A. G. and persons, firms or corporations in the Central and South American countries and Mexico operating under the direction or control of I. G. Farbenindustrie A. G. for the distribution of aspirin, aspirin compounds or other drug products pursuant to said Latin American contract as amended or supplemented, and prior to such date to surrender any and all licenses for the use of trade-marks owned or controlled by said I. G. Farben, its successors or subsidiaries.

"3. Each of the defendants, and its respective successors and subsidiaries, is hereby enjoined and restrained from paying any royalties or share of the profits pursuant to said Latin American contract as amended or supplemented."

## XX

The intervention of World War II prevented strict compliance with Paragraph III (2) of the final judgment, supra. Bayer was unable to surrender the licenses acquired under the contract of 1920, and in lieu thereof renounced its rights thereunder. Formal renouncements of these license agreements were handed to the Attorney General of the United States and were accepted by him. Exhibits O and P. The trade-marks which had been licensed to Bayer under the contract of 1920 were subsequently seized as enemy property by the various Latin American governments.

## XXI

It appears from the stipulation that after the entry of the consent decree Bayer discontinued the sale of aspirin products under the trade-marks in the Latin American markets. The local agencies were instructed "to continue to offer and sell aspirin products under such trademarks * * * until such time as aspirin products under new trademarks could be made available * * *." The aspirin business was undertaken by Sterling, and early in January of 1942, aspirin products were made available under new trade-marks coined and registered by it. These products were sold and distributed by the Sidney Ross Company and Sterling Products International, subsidiaries of Sterling, under the registered trade name "Mejoral."

## XXII

The assets of Hegemann were transferred to a new company, Laboratorios Aliviol, on December 27, 1941. The new company was wholly owned by Sterling and its subsidiaries. The assets of Suarry were transferred to a new company, Laboratorios Suarry, on November 27, 1941. Sterling held an 86% interest in the new company. Thereafter Suarry was dissolved and a certificate of dissolution was filed on January 13, 1942.

### First Cause of Action

The plaintiff asserts a claim for profits allegedly due for the years of 1940 and 1941 under the contract of 1920. It is alleged that the balance due for the year of 1940 is unknown and that the balance due for the year of 1941 is "at least $500,000, although the exact amount is not known." This claim is resisted by the defendant on the ground that the contract was in violation of the antitrust laws and, therefore, illegal.

■ The illegality of the contract cannot be denied. It was adjudged to be in violation of the antitrust laws and, therefore, illegal. United States of America v. Alba Pharmaceutical Co., Inc., et al., Exhibit N; see also, Paragraph XIX, supra. While the predecessor of the plaintiff was not a party to the earlier litigation, the final judgment is nevertheless determinative of the question of illegality. However, it is not necessary for this Court to rely solely on the prior adjudication. It clearly appears from the record before the Court that the contract of 1920 and the subsequent supplemental agreements were in restraint of trade and commerce and, therefore, illegal. 15 U.S.C.A. § 1; Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199; United States v. Bayer Co., D.C.S.D.N.Y., 135 F.Supp. 65. It follows that this claim of the plaintiff may not be enforced in this action.

The applicable rule was succinctly stated in the case of Bruce's Juices v. American Can Company, 330 U.S. 743, at page 755, 67 S.Ct. 1015, at page 1020, 91 L.Ed. 1219: "This Court has held that where a suit is based upon an agreement to which both defendant and plaintiff are parties, and which has as its object and effect [the] accomplishment of illegal ends which would be consummated by the judgments sought, the Court will entertain the defense that the contract in suit is illegal under the express provision[s] of that statute."

It was held earlier in the case of Continental Wall Paper Co. v. Louis Voight and Sons Co., 212 U.S. 227, at page 262, 29 S.Ct. 280, at page 292, 53 L.Ed. 486:

"* * * a court will not lend its aid, in any way, to a party seeking to realize the fruits of an agreement that appears to be tainted with illegality, although the result of applying that rule may sometimes be to shield one who has got something for which, as between man and man, he ought, perhaps, to pay, but for which he is unwilling to pay.

"In such cases the aid of the court is denied, not for the benefit of the defendant, but because public policy demands that it should be denied without regard to the interest of individual parties."

There can be no doubt that the rule is applicable here and bars the enforcement of the plaintiff's first cause of action.

The plaintiff presents no specific argument in support of its first cause of action but appears to rely on the case of Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 430, 3 L.Ed.2d 475. There a seller brought an action to recover the purchase price due for a shipment of onions. The purchaser defended on the ground that the sale was made "pursuant to and as an indivisible part of an agreement which violated § 1 of the Sherman AntiTrust Act * * * as amended, 15 U.S.C. § 1, 15 U.S.C.A. § 1." It appears from the summary of the facts that the agreement to purchase the onions was incidental to a contract in restraint of trade. It was held that in these circumstances the defense of illegality is not available. The decision rested on the exception to the general rule.

The exception to the general rule established in the case of Continental Wall Paper Co. v. Louis Voight and Sons Co., supra, was clearly defined in the case of Bruce's Juices v. American Can Co., supra: "But when the contract sued upon is not *intrinsically illegal,* the Court has refused to allow property to be obtained under a contract of sale without enforcing the duty to pay for it because of violations of the Sherman Act *not inhering in the particular contract in suit* and has reaffirmed the 'doctrine that "where a statute * * * gives a new right and declares the remedy, * * * the remedy can be only that which the statute prescribes." ' " (Emphasis by this Court.)

The case of Kelly v. Kosuga is clearly distinguishable from the case now before this Court. The plaintiff here seeks to enforce a claim for its share of the profits allegedly due under a contract in-

trinsically illegal. The first cause of action is governed by the general·rule and not the exception.

It is further argued by the defendant that the payment of profits under the contract of 1920 is expressly prohibited by the final judgment entered in the earlier litigation. The argument does not require extensive discussion. The final judgment provides as follows: "Each of the defendants, and its respective successors and subsidiaries, is hereby enjoined and restrained from paying any royalties or share of the profits pursuant to said Latin American contract as amended or supplemented." Subdivision III, paragraph 3. It is evident that payment of profits under the contract would violate the injunction.

### Second Cause of Action

■ The plaintiff asserts a claim to a 75% proprietary interest in the aspirin business established by the defendant in the Latin American territories after the entry of the final judgment, supra, and thereafter developed by the defendant's subsidiaries (Paragraph XXI, supra). The plaintiff seeks a declaratory judgment consistent with this claim and an accounting "with respect to said business." The theory upon which this claim is predicated seems to us to be ingenious.

The claim of the plaintiff is based upon the following allegations: first, that under the contract of 1920 the predecessors of the plaintiff, Leverkusen and I. G. Farben, and the predecessor of the defendant, Bayer, had been engaged in a "joint venture" for a period of twenty years prior to the entry of the final judgment; second, that the "joint venture" developed a large and profitable business in aspirin products in the Latin American countries; third, that upon the entry of the final judgment the defendant appropriated and converted to its own use the entire business of the "joint venture" including I. G. Farben's 75% interest therein; and fourth, that the defendant appropriated and converted to its own use upwards of $500,000, due the plaintiff's predecessor under the contract of 1920, and used these monies in furtherance of the new business. The defendant, of course, denies these allegations; however, we shall adopt them solely for the purpose of discussion.

It is argued by the plaintiff that the interest of its predecessors in the "joint venture" is, and has been, held in trust by the defendant and that the defendant is accountable to the plaintiff for that interest evaluated as of now. The argument overlooks an important factor: the predecessors of the plaintiff and the predecessors of the defendant had been engaged in an unlawful combination and conspiracy in restraint of trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C.A. § 1, and by reason thereof the contract of 1920, in addition to other contracts, was adjudged unlawful. The proprietary interest here claimed by the plaintiff had its origin in the illegal contract and any rights thereunder to which the plaintiff has succeeded may not be enforced in this action. See Rutkin v. Reinfeld, 2 Cir., 229 F.2d 248, 252 et seq.; Bishop v. American Preservers Co., 157 Ill. 284, 41 N.E. 765, 773, et seq. The enforcement of a right to such an interest would require recognition of the illegal contract and the right of the plaintiff to recover profits thereunder or their equivalent in property.

The mere fact that the plaintiff has here elected to label the relationship a "joint venture" is of no avail. "The fact that there is [a] common ownership or control of the contracting corporations does not liberate them from the impact of the antitrust laws. (Citation omitted.) Nor do we find any support in reason or authority for the proposition that agreements between legally separate persons and companies to suppress competition among themselves and others can be justified by labeling the project a 'joint venture.' Perhaps every agreement and combination to restrain trade could be so labeled." Timken Roller Bearing Co. v. United States, supra, 341 U.S. at page 598, 71 S.Ct. at page 974.

However, we cannot agree with the contention of the plaintiff that its predecessors, Leverkusen and I. G. Farben, and the predecessor of the defendant, Bayer, had been engaged in a joint venture for a period of twenty years prior to the entry of the final judgment. The dominant purpose of the contract of 1920 was the creation of a combination in restraint of trade and commerce, but the contract did not create a joint venture. This clearly appears from the facts recited in Paragraphs III to VII, inclusive, supra. The contract contained the usual terms and conditions of a license agreement and the contractual relationship between the parties lacked the essential attributes of a joint venture. Joe Balestrieri & Co. v. Commissioner of Internal Revenue, 9 Cir., 177 F.2d 867, 871; Detachable Bit Co. v. Timken Roller Bearing Co., 6 Cir., 133 F.2d 632, 635.

The statement of the Court of Appeals of New York in the case of Steinbeck v. Gerosa, 4 N.Y.2d 302, 175 N.Y.S.2d 1, at page 13, 151 N.E.2d 170, at pages 178 and 179, is apposite. It was therein stated: "An agreement to distribute the proceeds of an enterprise upon a percentage basis does not give rise to a joint venture if the enterprise does not represent a joinder of property, skills and risks (Gordon Co. v. Garcia Sugars Corp., 241 App.Div. 155, 271 N.Y.S. 303). 'The ultimate inquiry is whether the parties have so joined their property, interests, skills and risks that for the purpose of the particular adventure their respective contributions have become as one and the commingled property and interests of the parties have thereby been made subject to each of the associates on the trust and inducement that each would act for their joint benefit * * *.' (Hasday v. Barocas, 10 Misc.2d 22, 28, 115 N.Y.S.2d 209, 215.) The present case does not reveal such an amalgam of property or interests as would create a joint venture."

The relationship of the parties was governed by the express terms of the contract. It appears therefrom that Bayer acquired an exclusive right to the use of the Leverkusen trade-marks in connection with the sale and distribution of aspirin products in the several Latin American countries, and in return Leverkusen was to receive 75% of the net profits earned by Bayer. The business was to be conducted solely by Bayer. The contract did not provide for either a joint control of their individual properties or a right to common management of the business. It is of further significance that Leverkusen did not agree to share jointly in the losses of the business. The contractual relationship between the parties was not such as to require an accounting upon its termination.

### Third Cause of Action

The plaintiff here asserts a claim for damages for the alleged breach of the contract of 1920. This claim for damages is in the alternative. The complaint alleges that the actions of the defendant in 1941, and thereafter, constituted a breach of the said contract. It is further alleged that as a result of this breach of contract the plaintiff "lost its interest in a valuable going business which defendant appropriated to itself and its share of the profits of that business."

We find it difficult to ascertain the theory upon which this cause of action is based, and the briefs submitted on behalf of the plaintiffs are of little or no assistance. The contract was adjudged unlawful under Section 1 of the Sherman Act, supra, and the rights of the parties thereunder were terminated as of September 5, 1941, when the final judgment was entered. We cannot perceive how the subsequent actions of the defendant may be regarded as a breach of that contract. There is, however, a simple answer: the plaintiff may not maintain an action for damages based upon the alleged breach of an illegal contract.

However, if the claim here asserted is one for profits wrongfully withheld, the plaintiff is in no better position. These profits are not recoverable for the rea-

sons discussed under the heading "First Cause of Action."

### Fourth Cause of Action

The plaintiff asserts a 75% proprietary interest in the businesses of Hegemann and Suarry purchased by the defendant in 1937 and 1938. It is alleged that this proprietary interest is, and has been since the acquisition of the business, held in trust by the defendant for the benefit of the plaintiff. The plaintiff demands that the Court impress a trust upon the said businesses and that the defendant be compelled to render an account. The claim of the plaintiff and the right to relief is resisted by the defendant on the grounds of illegality.

These businesses were purchased by Sterling pursuant to agreements, the essentials of which are summarized in Paragraph X to XV, inclusive, supra. The purchase of these businesses eliminated competitors of Bayer in Chile and Argentina. It seems reasonably clear that the agreements pursuant to which these businesses were purchased were supplemental to the contract of 1920 and were in furtherance of the combination and conspiracy in restraint of trade and commerce. It is here stipulated that I. G. Farben's share of the purchase price for each of the said businesses was to be paid in part from its share of the profits under the contract of 1920. These agreements, like the contract of 1920, were intrinsically illegal.

The claim of the plaintiff to a proprietary interest in the said businesses assumes no greater posture than the claim for profits under the contract of 1920. The enforcement of the claim to a proprietary interest would permit the plaintiff to reap the fruits of the illegal agreements. Where parties concerned in illegal agreements are in pari delicto, the law will not aid either party, but will leave them without remedy against each other. See the cases hereinabove cited.

### Statute of Limitations

The present action was commenced on September 28, 1955, when the complaint was filed with the clerk of the court. Rule 3 of the Federal Rules of Civil Procedure, 28 U.S.C.A. It is agreed that the causes of action asserted therein accrued on September 6, 1941, or immediately thereafter, approximately three months prior to the formal declaration of war between the United States and Germany, to wit, December 11, 1941.

The defendant moves to dismiss the legal claim stated in the third count of the complaint (Third Cause of Action) on the ground that its enforcement is barred by the statute of limitations, N.J.S.A. 2A:14–1. The pertinent provisions of the statute read as follows: "Every action at law * * *, for any tortious injury to real or personal property, for taking, detaining, or converting personal property, for replevin of goods or chattels, * * *, or for recovery upon a contractual claim or liability, express or implied, not under seal, * * *, shall be commenced within 6 years next after the cause of any such action shall have accrued." The plaintiff does not dispute the applicability of the statute.

The plaintiff had been an enemy alien within the meaning of Section 2(a) of the Trading with the Enemy Act of 1917, 50 U.S.C.A.Appendix, § 2(a), and it is conceded by the parties that its procedural right to prosecute the present action was suspended during the period of the war. However, they disagree as to when the period of suspension terminated.

It is argued by the defendant that the suspension and the consequent disqualification of the plaintiff terminated on December 31, 1946, when the President of the United States formally proclaimed "the cessation of hostilities of World War II, effective twelve o'clock noon," on the said date. Proclamation No. 2714, U.S.Code Congressional Service 1947, page 1895, 50 U.S.C.A.Appendix, § 601 note. It is argued by the plaintiff that the suspension and consequent disqualification terminated upon the approval by the President, on October 19, 1951, of House Joint Resolution No. 289, entitled "Joint Resolution to terminate

the state of war between the United States and the Government of Germany." 50 U.S.C.A.Appendix preceding section 1, p. XX. The question presented for decision is thus sharply defined.

The United States Court of Appeals, Third Circuit, has heretofore sustained the right of the plaintiff to maintain the present action notwithstanding the fact that the fruits of recovery remained subject to seizure and vesting under House Joint Resolution No. 289, 65 Stat. 451, approved October 19, 1951, 50 U.S.C.A. Appendix, page XX preceding section 1. Farbenfabriken Bayer A. G. v. Sterling Drug, 3 Cir., 251 F.2d 300, 303, 305. The question now before this Court was not before the Court of Appeals and was, therefore, not decided. It was expressly stated in the opinion: "Whether or not Farben could have maintained its suit during the period from December 31, 1946 to October 19 or 21, 1951, is a question with which we need not concern ourselves for the suit at bar was commenced on September 28, 1955." The argument advanced in support of the present motion makes it necessary to decide the question.

There are several cases in which the Supreme Court has had occasion to treat of the terms "end of war" and "time of peace," e. g., United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317; Ludecke v. Watkins, 335 U.S. 160, 68 S.Ct. 1429, 92 L.Ed. 881; Wood v. Cloyd W. Miller Co., 333 U.S. 138, 68 S.Ct. 421, 92 L.Ed. 596, and Fleming v. Mohawk Wrecking & Lumber Co., 331 U.S. 111, 67 S.Ct. 1129, 91 L.Ed. 1375. These are cases in which the Supreme Court was called upon to decide what effect, if any, the cessation of hostilities had upon existing legislation, and particularly statutory war powers. It is clear that in these cases the Court regarded the political act of branches of the Government, other than the Judiciary, as necessary to the termination of war. We are of the opinion that these cases do not point to the solution of the problem now before us.

The case of Lee v. Madigan, 358 U.S. 228, 79 S.Ct. 276, 278, 3 L.Ed.2d 260, although not directly in point, is relevant. Therein the Supreme Court was called upon to construe the meaning of the words "in time of peace" in the context of Article of War 92, 10 U.S.C. (1946 ed. Supp. IV) § 1564. Therein, and for the purpose of the particular case before it, the Court declined to follow the axiom that "the termination of war is a political act." The Court stated, 358 U.S. at pages 230 and 231, 79 S.Ct. at page 278: "A more particularized and discriminating analysis must be made. We deal with a term that must be construed in *light of the precise facts of each case* and the impact of the particular statute involved." (Emphasis by this Court.) We are of the opinion that a like approach must be followed in the case now before us. The determination as to when the war ended, at least for the purpose of the present litigation, should be based upon a consideration of the facts and the equities in the light of the common law rule hereinafter discussed.

We find support for this approach in the opinion of the United States Court of Appeals, Farbenfabriken Bayer A. G. v. Sterling Drug, supra. It was therein held, 251 F.2d at page 303: "Nothing in the Act [Trading with the Enemy Act] prohibits an enemy alien from maintaining a suit in our courts. In respect to the bringing of suits Section 7(b) of the Act provides in pertinent part: 'Nothing in this Act shall be deemed to authorize the prosecution of any suit or action at law or in equity in any court within the United States by an enemy or ally of an enemy prior to the end of the war * * *.' *In short Congress in respect to an enemy maintaining a suit within the United States was content to rely on decisional or common law.*" (Emphasis by this Court.) See also Ex parte Colonna, 314 U.S. 510, 511, 62 S.Ct. 373, 86 L.Ed. 379.

The earlier rule under which an enemy alien, whether resident or non-resident, was denied access to the courts during

the period of war, was a rule of common law. When it was found incompatible with our concepts of justice, exceptions and modifications were engrafted upon it by decisional law. It was held by the Supreme Court in the case of Ex parte Kawato, 317 U.S. 69, at page 75, 63 S.Ct. 115, at page 118, 87 L.Ed. 58: "The ancient rule against suits by resident alien enemies has survived only *so far as necessary to prevent use of the courts to accomplish a purpose which might hamper our own war efforts or give aid to the enemy.* This may be taken as the sound principle of the common law today." (Emphasis by this Court.)

An exception to the strict common law rule was recognized by the Supreme Court in the case of Birge-Forbes Co. v. Heye, 251 U.S. 317, 40 S.Ct. 160, 161, 64 L.Ed. 286. Therein the Court sustained a judgment in favor of a resident of Bremen, Germany, who "had become an alien enemy by reason of the declaration of war between Germany and the United States." The judgment was first sustained by the Circuit Court of Appeals after the declaration of war. It is stated in the opinion of the Supreme Court, 251 U.S. at page 323, 40 S.Ct. at page 161: "There is nothing 'mysteriously noxious' (Coolidge v. Inglee, 13 Mass. 26, 37) in a judgment for an alien enemy. Objection to it in these days goes only so far as it would *give aid and comfort to the other side.*" (Emphasis by this Court.) It should be noted that the judgment provided for the payment of the sum recovered to the Alien Property Custodian.

The rights of an enemy alien under the common law rule was considered by the United States Court of Appeals, Third Circuit, in the case of Petition of Bernheimer et al., 130 F.2d 396. It is stated in the opinion, at page 397: "It is not even the case that a suit may not be prosecuted on behalf of an enemy subject *even though resident in enemy or neutral territory.* Such suits are *occasionally allowed* to proceed to judgment where *adequate measures may be taken to prevent advantage to the enemy.*" (Emphasis

by this Court.) There followed a discussion of the protective measures then available to prevent the transfer of the proceeds of the judgment to the enemy. The same protective measures were in effect and available during the period here in question and even prior thereto.

The precise question before this Court is whether or not the present action could have been brought after December 31st, 1946 and prior to June 25th, or thereabouts, 1949. It must be remembered that three months of the period of limitation had expired before the operation of the statute of limitations was suspended by the declaration of war. If the answer to the question is in the affirmative then the right of the plaintiff to maintain the action on the claim for breach of contract, asserted in the third count of the complaint (Third Cause of Action), is barred. The determination of the question, as we have heretofore indicated, should be based upon the consideration of the facts and equities in the light of the common law rule.

The hostilities between the United States of America and the Republic of Germany were terminated on May 8, 1945, upon the unconditional surrender of the latter. U.S.Code Congressional Service, 1945, pages 1014 to 1016, inclusive. The unconditional surrender was followed by the immediate occupation of Germany by the Allied Powers. These Powers assumed complete and absolute control over the German state on June 5, 1945. The conflict was not thereafter resumed. The cessation of hostilities was formally proclaimed by the President of the United States on December 31, 1946. Proclamation No. 2714, 12 F.R. 1, and also U.S.Code Congressional Service, 1947, page 1895, 50 U.S.C.A.Appendix, § 601 note. Thereafter, on February 10, 1947, separate treaties of peace were concluded with Italy, Bulgaria, Hungary, Roumania and Finland. U.S.Code and Congressional Service, 1947, at page 2321 et seq., 50 U.S.C.A.Appendix preceding section 1.

The right of Germany to resume trade was granted under General License No.

94, effective December 31, 1946. 31 C. F.R. 131.94, 1947 Supp., at page 4539. This license also authorized "any transaction which could be effected under § 131.53 (General License No. 53) if the countries licensed * * * were members of the generally licensed trade area." The only restriction in the said license related to property and income from property subject to vesting and seizure prior to the said effective date. The commercial and trade relations between the United States and Germany were resumed subject only to the restrictions contained in the license.

The Senate Committee on the Judiciary on June 23, 1947, in recognition of the cessation of hostilities, recommended the passage of Senate Joint Resolution 123, which had for its object the termination of "certain emergency and war powers." Senate Report No. 339; United States Code Congressional Service, 1947, page 1359 et seq. The Joint Resolution was approved on July 25, 1947. 61 Stat. 449. It repealed many of the temporary statutes enacted during World War II and terminated the war and existing emergencies with respect to certain other statutory provisions which are in effect only during a period of war or emergency.

The Federal Republic of Germany, embracing the zones then occupied by the forces of the United States, Great Britain and France, was proclaimed at Bonn, its capital, on May 23, 1949, and came into formal existence on September 21, 1949. The proclamation followed the adoption of the Basic Law, a democratic constitution adopted on May 12, 1949, and approved by the Allied Control Council. The elections were held on August 14, 1949, and thereafter, on September 21, 1949, the new government was formally established under Theodor Heuss, as President, and Konrad Adenauer, as Chancellor. The Allied military government was disestablished and, except as to military and foreign affairs, the Western powers retained only supervisory authority exercised through the Allied High Commission.

The rule under which a nonresident enemy alien is denied access to the courts is one of common law. It is applied only in "time of war" to prevent use of the courts to accomplish a purpose which might impede the war effort or give aid and comfort to the enemy. The provision of Section 7(b) of the Trading with the Enemy Act, supra, 50 U.S.C.A.Appendix, § 7(b), has been construed as Congressional recognition of the common law rule established by judicial decision long prior to the Act. Ex parte Colonna, supra; Farbenfabriken Bayer A. G. v. Sterling Drug, supra.

It appears from the reported decisions that the meaning of the term "time of war" is flexible and must be interpreted in the sense in whch it is used in the law. Lee v. Madigan, supra, 358 U.S. at page 231, 79 S.Ct. at page 278. We are of the opinion that where, as here, we are concerned only with the rights of private litigants, the term must be interpreted in the sense in which it is used in the common law rule. We are of the further opinion that the interpretation is one for judicial determination in light of the precise facts.

The United States Court of Appeals in Farbenfabriken Bayer A. G. v. Sterling Drug, supra, in reference to Section 7 (b) of the Act, supra, stated: "* * *, we are of the opinion that a failure to authorize a suit is *a bar to suit when the strict common law rule that an enemy cannot maintain a suit in our courts is in effect, * * *.*" [251 F.2d 303.] (Emphasis by this Court.) If we interpret this language correctly, it is the opinion of the United States Court of Appeals that the provision of Section 7 (b) of the Act is applicable only when the common law rule "is in effect" in the courts. The rule is "in effect" in the courts during the period of war when its application is "necessary to prevent use of the courts to accomplish a purpose which might hamper our own war efforts or give aid to the enemy." [317 U. S. 69, 63 S.Ct. 118.]

We are of the opinion that the present action could have been brought prior to

June 25, 1949. It clearly appears from the historical facts that by May 23, 1949, when the Federal Republic of Germany was proclaimed, there had been a cessation of hostilities without any intention on the part of either party to resume the conflict. The emergency and war powers created by statute, with certain exceptions, had been terminated, and commercial and trade relations between Germany and the United States had been restored. The application of the common law rule was no longer "necessary to prevent use of the courts to accomplish a purpose which might hamper our own war efforts or give aid to the enemy." It follows that the third cause of action is barred by the statute of limitations.

The defendant moves to dismiss the claim for profits asserted under the "First Cause of Action" on the ground that its prosecution is barred by the doctrine of laches. This claim is essentially a legal claim for breach of contract based upon the failure of the defendant to make payment of the profits due under the contract of 1920. It is our opinion that this claim is barred by the statute of limitations. However, if it is regarded as a claim for an accounting cognizable in equity, it is barred by the doctrine of laches for the reasons hereafter considered.

### Doctrine of Laches

The defendant moves to dismiss the claims asserted under the "Second Cause of Action" and "Fourth Cause of Action", supra, on the ground that they are barred under the doctrine of laches. These are claims to a proprietary interest in certain businesses and are supported by the charge that upon termination of the "joint venture" upon the entry of the final judgment, supra, the defendant appropriated and converted the assets of the businesses to its own use. These are essentially claims for the unlawful conversion of property and, therefore, the right of the plaintiff to prosecute them is governed by the express language of the statute of limitations, supra

However, for the purposes of the present motion we shall regard the action as one in equity to compel an accounting and to settle a controversy between joint venturers. Such an action is cognizable either in a court of law or a court of equity; the jurisdiction of these courts in this type of action is concurrent. While the statute of limitations is no bar to an action in equity, its provisions may be invoked as a guide where the action is one also cognizable at law. Conover v. Wright, 6 N.J.Eq. 613; Arnett v. Finney, 41 N.J.Eq. 147, 3 A. 696; Depew v. Colton, 60 N.J.Eq. 454, 46 A. 728; Bahr v. Breeze Corporations, 126 N.J.Eq. 124, 8 A.2d 185. It is well established that where there is both a legal and an equitable remedy for the same wrong, if the legal remedy is barred by the lapse of time, the equitable remedy is also barred. Ibid. The rule is applicable to an action in equity to enforce an implied or constructive trust. Condit v. Bigalow, 64 N.J.Eq. 504, 54 A. 160.

Since the jurisdiction of the Court in the present action is based on diversity of citizenship and is invoked under Section 1332(a) (2) of Title 28 U.S.C.A., the local rule is applicable. Guaranty Trust Co. of New York v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079; Russell v. Todd, 309 U.S. 280, 60 S.Ct. 527, 84 L.Ed. 754. It was held in the case of Russell v. Todd, 309 U.S. at page 289, 60 S.Ct. at page 532: "Even though there is no state statute applicable to similar equitable demands, when the jurisdiction of the federal court is concurrent with that at law, or the suit is brought in aid of a legal right, equity will withhold its remedy if the legal right is barred by the local statute of limitations."

It follows that if the claims asserted under the "Second Cause of Action" and the "Fourth Cause of Action" are legal claims for the unlawful conversion of property, they are barred by the statute of limitations. If they are regarded as equitable claims, they are barred under the doctrine of laches.

 

The motion for summary judgment filed by the defendant is granted for the reasons stated. The motion for summary judgment filed by the plaintiff is dismissed. The attorneys for the defendant shall prepare and submit to the Court, on notice to the attorneys for the plaintiff, an appropriate order.